Judge BAKER
delivered the opinion of the Court.
Appellant was a private first class (E-3) serving with the 411th Military Police Company in Iraq. On December 16, 2003, he was convicted pursuant to his pleas by a military judge sitting alone of false official statements and wrongful use and distribution of controlled substances on divers occasions, in violation of Articles 107 and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 912a (2000), respectively. The military judge sentenced Appellant to a bad-conduct discharge, confinement for eight months, and reduction to grade E-1. The convening authority approved the bad-conduct discharge and grade reduction, but in accordance with a pretrial agreement only approved seven months of confinement. On February 2, 2006, the United States Army Court of Criminal Appeals summarily affirmed. United States v. Wise, No. ARMY 20031310 (A.Ct.Crim.App. Feb. 2, 2006). Upon Appellant’s petition we granted review of the following modified issue:
WHETHER APPELLANT’S CONFINEMENT CONDITIONS, INCLUDING AND IN PARTICULAR WITH RESPECT TO HIS CLAIM OF HAVING BEEN CONFINED WITH ENEMY PRISONERS OF WAR IN IRAQ, WERE UNLAWFUL, AND WHETHER, IN THE CONTEXT PRESENTED, APPELLANT FORFEITED HIS CLAIMS OF UNLAWFUL POST-TRIAL PUNISHMENT BY FAILING TO EXHAUST HIS ADMINISTRATIVE REMEDIES UNDER UNITED STATES V. WHITE, 54 M.J. 469 (C.A.A.F.2001).
A prisoner must seek administrative relief prior to invoking judicial intervention to redress concerns regarding post-trial confinement conditions. United States v. White, 54 M.J. 469, 472 (C.A.A.F.2001). Absent some unusual or egregious circumstance this means that the prisoner has exhausted the prisoner grievance system in his detention facility and that he has petitioned for relief under Article 138, UCMJ, 10 U.S.C. § 938 (2000). Id. For the case-specific reasons stated below, including Appellant’s unrebut *470 ted statements regarding the nature of his confinement, his informal efforts to seek redress, and the unusual circumstances in which he was confined — which according to Appellant included the absence of a formal grievance process — we conclude that a review of Appellant’s claims is warranted.
Turning to Appellant’s allegation that he was detained with Iraqi enemy prisoners of war (EPWs) in violation of Article 12, UCMJ, 10 U.S.C. § 812 (2000), we conclude that even if the facts are as alleged by Appellant, based on the plain text and legislative history to Article 12, UCMJ, Appellant was not confined in “immediate association” with enemy prisoners or other foreign nationals.
Appellant also avers that he was placed in irons while confined in Iraq, in violation of Article 55, UCMJ, 10 U.S.C. § 855 (2000). Unlike the absolute proscription in Article 55, UCMJ, against flogging and branding, the proscription against the use of irons is qualified. Irons are permitted for the purposes of safe custody. As there may be well-founded reasons for the use of irons in the combat situation presented, applying the principles of United States v. Ginn, 47 M.J. 236 (C.A.A.F.1997), we are unable to resolve Appellant’s claim without further fact-finding. As a result, we remand this aspect of the case to the Court of Criminal Appeals, which is authorized to resolve the factual issue of why Appellant was confined in Tikrit with irons. If the Court of Criminal Appeals orders further fact-finding, including a Du-Bay[1] hearing, and the convening authority determines that such fact-finding is impracticable, the convening authority may moot the issue and the necessity of further faet-finding by awarding Appellant a credit of twenty-one days for that period of time Appellant alleges in his unrebutted affidavit that he was confined in double irons in the Tikrit compound.
BACKGROUND[2]
During operations in Iraq, the 4th Infantry Division captured and detained a number of EPWs.[3] According to Appellant’s affidavits, at the time of his court-martial, 100 to 150 EPWs were being held in the 4th Infantry Division EPW confinement area in Tikrit, Iraq. The confinement area, commonly referred to as “the cage,” was not a structure but an area cordoned off by concertina wire, and further subdivided by concertina wire into at least two sections. American soldiers, including Appellant, were assigned as guards and escorted the EPWs any time it was necessary to take them beyond the confines of the wired area.
Following his conviction, Appellant was ordered into confinement in “the cage” pending transfer to the confinement facility in Kuwait to serve the remainder of his sentence. Appellant and two fellow American soldiers were confined in a section separated from the EPWs by “a single strand of concertina wire.” According to Appellant, he was close enough to the Iraqi EPWs for some of the EPWs to approach the dividing wire and attempt to engage the Americans in conversation. Appellant also states that one of the EPWs recognized him as a former guard, and that he recognized several of the EPWs as prisoners he had once guarded. Further, he states that two of the EPWs had tuberculosis and were quarantined from the others, but were separated from Appellant by no more than fifteen feet and one coil of concertina wire.
*471 Appellant states that he was ordered to wear a blue jumpsuit, similar to the one worn by many of the EPWs. He also asserts that for the seven days he remained confined in “the cage,” he was kept in “double irons”— leg shackles and handcuffs — even while eating and sleeping. The handcuffs were only removed when he was taken to the latrine.
After a week, Appellant was transferred to a confinement facility at Camp Arifjan, Kuwait, where he served the remainder of his sentence before returning to the United States.
Appellant argues that the conditions of his post-trial confinement violated his rights. In particular, with respect to his placement in irons, Appellant claims a violation of Article 55, UCMJ. With respect to his placement in proximity to the Iraqi prisoners, Appellant claims a violation of Article 55, UCMJ, and of his Eighth Amendment right to be free from “cruel and unusual punishment.” See U.S. Const, amend. VIII.
DISCUSSION
This case poses two separate questions:
(1) Is Appellant barred from pursuing his claim by a failure to exhaust his administrative remedies while confined in Iraq?; and
(2) Was Appellant’s incarceration in the enclosed confinement area in violation of his rights in that he was:
a. Placed in immediate association with EPWS; or
b. Placed in double irons for the extent of his stay in “the cage”?
I. Exhaustion of Administrative Remedies
“[A] prisoner must seek administrative relief prior to invoking judicial intervention” to redress concerns regarding post-trial confinement conditions. White, 54 M.J. at 472; United States v. Miller, 46 M.J. 248, 250 (C.A.A.F.1997) (quoting United States v. Coffey, 38 M.J. 290, 291 (C.M.A.1993)). This requirement “promot[es] resolution of grievances at the lowest possible level [and ensures] that an adequate record has been developed [to aid appellate review].” Miller, 46 M.J. at 250.
We review factual findings under a clearly erroneous standard, but the “ultimate determination” of whether an Appellant exhausted administrative remedies is reviewed de novo, as a mixed question of law and fact. See, e.g., United States v. Anderson, 55 M.J. 198, 201 (C.A.A.F.2001).
Exhaustion requires Appellant to demonstrate that two paths of redress have been attempted, each without satisfactory result. Appellant must show that “absent some unusual or egregious circumstance ... he has exhausted the prisoner-grievance system [in his detention facility] and that he has petitioned for relief under Article 138.” White, 54 M.J. at 472 (citation and quotation marks omitted); see also United States v. Lovett, 63 M.J. 211, 215 (C.A.A.F.2006) (holding that in order to claim Eighth Amendment violations, the appellant must show, inter alia, “that he has exhausted the prisoner-grievance system ... and that he has petitioned for relief under Article 138”) (citation and quotation marks omitted).
Article 138, UCMJ, provides that:
Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior officer, who shall forward the complaint to the commissioned officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had there on.
Since a prime purpose of ensuring administrative exhaustion is the prompt amelioration of a prisoner’s conditions of confinement, courts have required that these complaints be made while an appellant is incarcerated. See, e.g., United States v. White, No. ACM 33583, 1999 CCA LEXIS 220, at *4, 1999 WL *472 605616, at *1 (A.F.Ct.Crim.App. July 23, 1999) (holding that solely raising conditions of confinement complaints in post-release clemency submissions is inadequate to fulfill the requirement of exhausting administrative remedies and that “after the appellant has been released from confinement ... we have no remedy to provide”), aff’d, White, 54 M.J. at 475.
In the current case, there is no record of Appellant filing complaints about his confinement conditions while in “the cage,” either through a prisoner grievance system or to his chain of command under Article 138, UCMJ. Even when Appellant was removed from the confinement area and transported to Kuwait, complaints regarding his confinement conditions in Iraq were still not raised. Pursuant to Rule for Courts-Martial (R.C.M.) 1105(b)(2)(D), Appellant submitted a clemency request on January 1, 2004, less than a week after his removal from the confinement area in Tikrit. In that request he did not reference the conditions in Tikrit. Appellant’s counsel also did not raise the matter in an additional clemency submission filed February 6, 2004.
However, Appellant states that he raised concerns about confinement early during the course of his legal proceedings. Appellant initially raised this issue immediately after his conviction and before his confinement. Worried that he would be incarcerated with the EPWs, Appellant spoke with his battalion commander about his concerns and the commander attempted to arrange for Appellant to be held in his unit area in Tikrit until he could be transferred to a confinement facility to serve his sentence. According to Appellant, his battalion commander’s superior declined and ordered him into “the cage.” Pri- or to incarceration, Appellant was also in contact with other representatives from his unit and his trial defense counsel, to whom he relayed his concerns. These attempts were also to no avail.
Appellant further claims that upon being placed in “the cage,” he was given only a rudimentary in-processing, was denied contact with his attorney, and was provided no explanation of how to raise complaints. Appellant also claims that he had no knowledge of Article 138, UCMJ, procedures and further states that he did not believe that he had any way of raising his concerns while in “the cage.”
The present record does not reflect that Appellant’s command in Tikrit had an institutionalized complaint mechanism specific to the EPW confinement area, and Appellant’s attempts to informally communicate with, and complain to, his guards were met with silence. On one of the few occasions that the guards responded to Appellant’s concerns— when Appellant raised his anxiety about being kept in close proximity to two EPWs who he was informed were suffering from tuberculosis — the guards spurned his complaints. Additionally, notwithstanding the preference for raising the issue while undergoing the alleged onerous confinement conditions, in this case Appellant was kept under the complained-of conditions for only a week, limiting the possible time during which to complain.
Appellant also states that he attempted to lodge complaints about “the cage” as soon as he was afforded the opportunity to do so once he arrived at Camp Arifjan, Kuwait. He raised his complaints about his treatment in Iraq with the guard force supervisor at Camp Arifjan but was told that he could not use the Camp Arifjan complaint system to lodge an objection about his confinement in another location. Finally, less than a month after being released from confinement and returning to the United States, Appellant swore an affidavit that detailed the conditions he experienced in Iraq.
Based on the foregoing, we conclude that in the “unusual” circumstances presented, Appellant is entitled to have the merits of his claims addressed. Among other things, Appellant has asserted that he made numerous informal attempts to raise the conditions of his confinement in Iraq with his chain of command. Accepting Appellant’s affidavits on their face, Appellant asserts that he was not briefed on, nor otherwise made aware of, any formal process of complaint at the facility in Tikrit during the first year of combat operations in Iraq. He further states that his efforts while confined in Kuwait to raise *473 his concerns were brushed aside. The Government has chosen not to factually rebut Appellant’s affidavits. Those allegations regarding confinement with EPWs and the use of leg irons are serious, raise matters of first impression for this Court for which there is no extant guidance, and are potentially subject to repetition during ongoing combat operations. In such circumstances, we conclude that unusual circumstances warrant review of Appellant’s claims, notwithstanding his failure to exhaust those formal mechanisms of administrative review usually associated with permanent and established facilities.
In reaching this conclusion, we are cognizant that Appellant was represented by counsel. Further, defense counsel was sufficiently established in the operational setting presented to file for clemency using letterhead designated “U.S. Army Trial Defense Service, Region IX, Tikrit Field Office, Tikrit, Iraq.” Ordinarily, we would expect competent counsel to raise confinement concerns like Appellant’s at the time they are brought to counsel’s attention, or to indicate as part of the appellate record, why they were unable to do so in the context presented. These factor’s weigh in favor of a conclusion that Appellant did not exhaust his administrative remedies. Nonetheless, in our view, it factors into, but does not ultimately change, our conclusion that the better view is that unusual circumstances warrant consideration of Appellant’s claims. In this regard we note the absence of guidance from this Court on the subject of exhaustion in an operational setting.
II. Did, the Conditions of Confinement in Tikrit Violate Article 12, UCMJ, Article 55, UCMJ, or the Eighth Amendment?
We now examine the specific aspects of confinement about which Appellant complains. This Court reviews de novo the question of whether an appellant has been subject to impermissible conditions of post-trial confinement in violation of Article 55, UCMJ, and/or the Eighth Amendment. White, 54 M.J. at 471.
Appellant’s initial grievance is that the conditions of confinement in Tikrit and then at Camp Arifjan, Kuwait, subjected him to conditions that did not meet the standards for the incarceration of United States Army prisoners set out in the Dep’t of the Army, Reg. 190-47, Military Police, The Army Corrections System (June 15, 2006) [hereinafter AR Reg. 190-47]. In this context, we find his complaints regarding his confinement in Kuwait without merit[4] and turn to the two issues that warrant review: Appellant’s claim of having been incarcerated in irons and his incarceration in proximity to enemy prisoners of war during the seven days in Tikrit.
1. Appellant’s Incarceration with Iraqi Prisoners of War
Article 12, UCMJ, provides: “Confinement with Enemy Prisoners Prohibited[.J No member of the armed forces may be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces.”[5] (emphasis added).
Interpreting Article 12, UCMJ, is an issue of statutory interpretation, which we review de novo, United States v. Martinelli, 62 M.J. *474 52, 56 (C.A.A.F.2005), as is the question whether Article 12, UCMJ, has been violated. The interpretation of Article 12, UCMJ, in this context is an issue of first impression.
A. Text of the Statute
The prohibition to which Article 12, UCMJ, is directed is not absolute in the sense that flogging or branding is proscribed in Article 55, UCMJ. Rather, the prohibition against “placing” American personnel in association with enemy prisoners or other foreign nationals is qualified by the nature of the association. Only “immediate association” is directly proscribed. Thus, the interpretation of Article 12, UCMJ, rests on an understanding of not just “association” but of the particular type of association to which the article is directed. Although the other terms in Article 12, UCMJ, are straightforward and can and should be read in light of their plain meaning and prior use in our case law, “immediate association” is subject to multiple interpretations. See United States v. Warner, 62 M.J. 114, 120 n. 30 (C.A.A.F.2005) (citing Lamie v. United States Trustee, 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)).
There is no explanatory introductory paragraph in the article that sheds light on the meaning or purpose of the statute. The few military eases that have used the term “immediate association” have done so outside the context of Article 12, UCMJ, analysis and are not on point.[6] The dictionary is only marginally more helpful. The dictionary defines “immediate” as “direct” or “proximate.” We&sfer’s Third New International Dictionary Unabridged (2002), available at http:// unabridged.merriamwebster.com (last visited Apr. 24, 2007). “Association” is defined as the state of being “connected” or “combine[d].” Webster’s Ninth New Collegiate Dictionary 110 (9th ed.1991). Thus, it appears that Article 12, UCMJ, prohibits United States personnel from being confined in a manner so that they would be directly connected or combined with captured foreign personnel. Appellant contends that he was separated from Iraqi prisoners by only a “single strand of concertina wire.” Yet, even a single strand of wire is not an insubstantial barrier and may have prevented Appellant’s “connection” or “combination” with captured personnel. Concertina wire is high-strength, spring-steel wire with multiple barbs attached at short intervals. Field Fortifications, Subcourse EN0065, Edition B, United States Army Engineer School, Fort Leonard Wood, Missouri, Lesson 4, § 4r-5.a, available at http://www.globalsecurity.org/military/ hbrary/pohey/army/accp/en0065Ae4.htm (last visited Apr. 24, 2007). Wires form coils so that when they are unrolled they take on a cylindrical shape akin to a concertina. See id. Persons handling concertina wire wear heavy reinforced gloves to avoid being cut by the wire. See id. §§ 4-2.6., 4-6. The standard concertina wire used by the United States military creates a cylindrical shape three feet in diameter. Id. § 4-5.a.
In our view, a single strand of concertina wire represents a real boundary between Appellant and foreign personnel. Nonetheless, the fundamental question remains: what sort of separation is mandated by Article 12, UCMJ? With the text of the statute indeterminate, and in the absence of case law, we “turn to the primary source of the statute,” its legislative history, for guidance. Warner, 62 M.J. at 120 n. 30.
*475 B. Legislative History
Unclear language can become clear if the congressional intent behind the legislation is reviewed. See, e.g., United States v. Disney, 62 M.J. 46, 51 (C.A.A.F.2005) (looking inter alia to legislative history to divine the purpose of a statute criminalizing the certain activities with explosive materials); United States v. Reeves, 62 M.J. 88, 93 (C.A.A.F.2005) (invoking legislative history to understand the congressional purpose behind the Child Pornography Prevention Act of 1996); Loving v. United States, 62 M.J. 235, 241 (C.A.A.F.2005) (relying on legislative history to glean the congressional intent behind Article 76, UCMJ, 10 U.S.C. § 876 (2000)).
The legislative history surrounding Article 12, UCMJ, identifies the concerns it sought to address. Article 12, UCMJ, stems from conditions of confinement experienced in World War II, a still-recent event when the UCMJ was debated in 1950. During that war the various military branches conducted two million courts-martial of United States personnel. James B. Roan & Cynthia Buxton, The American Military Justice System in the New Millennium, 52 A.F. L. Rev. 185, 187 (2002). Some American servicemembers who had been convicted in these courts-martial had, at times, been held in prisons overseas with prisoners of war or other enemy nationals. See Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcommittee of the House Committee on Armed Services, 81st Cong. 914-16 (1949), reprinted in Index and Legislative History, Uniform Code of Military Justice (1950) (not separately paginated) [hereinafter Legislative History].
The legislation from which Article 12, UCMJ, eventually derived was initially presented in the House of Representatives, as a part of the Selective Service Act directed to remediating the concerns about United States personnel being confined with foreign nationals during World War II. According to testimony from Robert W. Smart, a professional staff member of the House Committee on Armed Services at the time, the article was originally “brought before the House [by] Mr. [Omar T.] Burleson of Texas [the previous year during debates on the Selective Service Act, with the sole goal ensuring] that American boys were not confined with prisoners of war or other enemy nationals,” which Representative (Rep.) L. Mendel Rivers, the vice chair of the Committee stated “[often] happened during the war.” Id. at 914. Language in line with Rep. Burleson’s amendment was adopted in Article 16 of the Selective Service Act of 1948, which stated that American servicemen could not be “confined with enemy prisoners or any other foreign nationals outside of the continental limits of the United States.” Selective Service Act of 1948, Pub.L. No. 80-759, § 212, 62 Stat. 604, 630 (1948) (emphasis added).
However, once debate on the UCMJ commenced before the House Committee on Armed Services in March 1949, it became evident that the breadth of the article’s language could create difficulties for military operations overseas. Felix Larkin, Assistant General Counsel in the Office of the Department of Defense, testified before the Committee and asserted that in many places “[t]here may not be more than one jail or place of confinement.” Legislative History, supra, at 914. Thus, if prisoners of war or enemies were already incarcerated in the single facility, no American could be imprisoned with them, and vice versa.
Mr. Larkin and the Committee were especially concerned about this language as it pertained to the Navy. Id. at 914-15. If a naval vessel captured an enemy vessel at sea it may have been unable to incarcerate enemy sailors in the ship’s brig if American sailors were already confined there. Id.
This concern led the Committee to propose and the Congress to adopt the “immediate association” language, which, according to Mr. Larkin, meant that “you could keep [American and foreign personnel] in the same jail [but had to] segregate] them in different cells.” Legislative History, supra, at 914. As the commentary to the proposed article stated, it was “intended to permit confinement in the same guardhouse or brig, but would require segregation.” Id.
Appellant avers that he was held in a facility that also housed Iraqi prisoners of *476 war. As he recounted, “[t]here were EPWs in the cage when I was housed there, although we were separated by a strand of concertina wire.” Despite this barrier, the Iraqis were close enough for some of prisoners to attempt to engage Appellant in conversation and for one prisoner to recognize Appellant, and for Appellant to recognize many of his former prisoners. Moreover, for five of the seven days Appellant was as close as fifteen feet to two of quarantined Iraqis.
The situation in forward positions during combat — as in the current case — is not dissimilar from the hypothetical Navy ship at sea that has captured enemy sailors. In both cases, capacity to house prisoners may be limited and thus placing foreign and American prisoners in the same facility — while ensuring some segregation — is in line with the text as well as the spirit and history of Article 12, UCMJ. Indeed, the alteration of the text of Article 12, UCMJ, from the original seen in the Selective Service Act of 1948, reflects that Congress specifically intended to avoid designating situations like the one in which Appellant found himself as per se violations of Article 12, UCMJ.
As Mr. Larkin testified in 1949, the drafters intended Article 12, UCMJ, to “prohibit incarceration in close association but not with because ‘with’ has the connotation that you could not keep them in the same prison and there may be only one.” Legislative History, swpra, at 915. The following testimonial exchange between Mr. Larkin and Rep. John Anderson further emphasized this point, expanding it to include both United States facilities and “foreign jails”:
MR. ANDERSON: [I]s there any place in the code that expresses prohibition against confining our men in foreign jails?
MR. LARKIN: No; but this one prevents them being confined with enemy prisoners of war or foreign nationals not members in the same cell.
MR. ANDERSON: [Ujnder this code, could a commanding officer have an enlisted man ... confined in a foreign jail?
MR. LARKIN: Yes, he could, for a short time or whatever time is necessary. But if they are so confined they may not be in immediate association with any [foreign nationals].

Id.

In the only federal case in either the military or civilian systems directly addressing this provision, the United States Court of Appeals for the Tenth Circuit — hearing a habeas corpus claim — came to the same conclusion, holding that the “heart of this prohibition [in Article 12, UCMJ] lies in the words ‘in immediate association’ and is not necessarily violated by the general confinement of the designated classes of prisoners within the same institution.” Kuykendall v. Taylor, 285 F.2d 480, 481 (10th Cir.1960).[7]
Based on this analysis, and assuming Appellant’s statements as factually accurate, we conclude that Appellant’s conditions of confinement while housed in the EPW “cage” did not violate his Article 12, UCMJ, rights.[8] *477 See Ginn, 47 M.J. at 248 (“[I]f the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellee’s favor, the claim may be rejected on that basis.” Ginn, 47 M.J. at 248.) The Government’s segregation of Appellant from enemy prisoners and other foreign nationals was manifest and bona fide, and as a result, if indeed he was separated by concertina wire,[9] Appellant was not imprisoned in “immediate association” with foreign personnel.
2. Appellant’s Incarceration in Irons
According to Appellant’s unrebutted affidavit, for the entirety of his incarceration in the EPW confinement area he was placed in double irons, i.e., handcuffs and leg cuffs. His handcuffs were only removed when he was escorted to the latrine. These facts implicate Appellant’s rights under Article 55, UCMJ, which provides that:
Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by any court-martial or inflicted upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited.
Emphasis added.
To have been permissible, the use of irons must have met two criteria: such use could not have been for punishment, and the irons must have been employed to effectuate “safe custody.” Regarding the possible punitive use of the irons, this Court has stated that “[I]n the absence of a showing of intent to punish, a court must look to see if a particular restriction ..., which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective.” Palmiter, 20 M.J. at 95 (quoting Bell v. Wolfish, 441 U.S. 520, 539 n. 20, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)) (alteration in original). Further, as the United States Court of Appeals for the Tenth Circuit held:
Prison officials have wide discretion to determine what measures should be taken in order to preserve order and security in a detention facility. Determining [for example] that a particular inmate poses a security risk to fellow inmates and to corrections personnel [or to himself], and requiring that inmate to wear ankle and wrist restraints is certainly within this discretion.
Sanders v. Hopkins, 131 F.3d 152 (10th Cir.1997) (table decision) (published in text format at 1997 U.S. App LEXIS 34179, at *6-*7,1997 WL 7552776, at *2).
This Court has not addressed the meaning of “safe custody.” Lower courts have found the use of irons appropriate when necessary to limit the potential risk of harm to an inmate or harm caused by an inmate, or to prevent a well-founded concern regarding escape. For instance, the United States Navy Court of Military Review found that leg irons were appropriately used for safe custody when they were placed on a known violent prisoner who had recently threatened an officer, and the prisoner was only constrained in such a manner for the duration of a two-hour transport flight. United States v. Ewing, 44 C.M.R. 738, 741 (N.C.M.R.1971). Similarly, the United States Coast Guard Board of Review approved the use of leg irons on a prisoner who had escaped in the past and “showed ... signs of [once again] going over the hill.” United States v. St. Croix, 18 C.M.R. 465, 467 (C.G.B.R.1955). The logic of Ewing and St. Croix is parallel to holdings in the civilian courts. See, e.g., LeMaire v. *478 Maass, 12 F.3d 1444, 1457 (9th Cir.1993) (holding that keeping a known violent prisoner shackled and handcuffed even when showering was permissible so as to protect staff arid fellow inmates); Selby v. Martin, 84 Fed.Appx. 496, 498-99 (6th Cir.2003) (holding that confinement in leg irons and belly chains was allowed for an inmate convicted of attempted escape).
Though the location of Appellant’s confinement in Tikrit, Iraq, may have limited his escape risk, we are not provided any evidence of his propensity to abscond. Nor are we provided any evidence that the use of irons was necessary for safe custody. Such evidence is dispositive of an Article 55, UCMJ, violation regarding the use of irons, and once an appellant makes a colorable claim that he was put in irons, the burden for establishing that an exception to the statute’s prohibitions were met falls to the government. In the context of an Article 13, UCMJ, claim, the appellant is experiencing the deprivations, or has experienced the deprivations, of which he complains and thus retains the burden of demonstrating the violative conditions. However, in this context, the information as to whether the irons were used as punishment or were used to effectuate “safe custody” is within the possession of the government.
As a result, on the present record before this Court we lack the necessary facts to determine whether the use of irons was necessary for “safe custody” and thus nonpunitive given the combat context presented. Such a finding “may justify [the] imposition of conditions and restrictions” without those conditions and restrictions becoming punitive. Bell, 441 U.S. at 539-40, 99 S.Ct. 1861 (“[I]f a particular condition or restriction ... is reasonably related to a legitimate governmental objective, it does not, without more, amount to ‘punishment.’ ”).
DECISION
The decision of the United States Army Court of Criminal Appeals is affirmed as to the findings but set aside as to the sentence. The record of trial is returned to the Judge Advocate General of the Army for remand to that court. The Court of Criminal Appeals is authorized to resolve the factual issue of why Appellant was confined in Tikrit with irons. If necessary, that court may order a DuBay hearing. If the Court of Criminal Appeals orders further fact-finding and the convening authority determines that such fact-finding is impracticable, the convening authority may resolve the matter and moot the necessity for further fact-finding by awarding Appellant twenty-one days of confinement credit for that period of time Appellant alleges in his unrebutted affidavit that he was confined in double irons in the Tikrit compound. Following this action, Articles 66 and 67, UCMJ, 10 U.S.C. §§ 866, 867 (2000), shah apply.

. United States v. DuBay, 17 C.M.A. 147, C.M.R. 411 (1967).

. Descriptions of Appellant’s confinement are from two sworn affidavits Appellant executed in preparation for his appeal. There is no evidence or affidavits provided on behalf of the Government rebutting the information in these documents. "Under these circumstances, we shall treat the statements in the documents as establishing the factual setting of the appellate proceedings.” United States v. Simon, 64 M.J. 205, 207 (C.A.A.F.2006) (citing Ginn, 47 M.J. at 250). This is in accord with the Supreme Court’s view that "[s]olemn declarations in open court carry a strong presumption of verity.” Blackledge v. Allison, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

. For the purposes of this opinion, we take Appellant’s nomenclature as stated, and express no view as to whether the individuals referenced are appropriately referenced as EPWs, "other foreign nationals,” or in some other manner.

. AR 190-47 is a 100-plus-page document detailing the Army corrections program, including the appropriate conditions of confinement for Army inmates. The extensive list includes details ranging from the physical design of facilities to the provision of "health and comfort supplies” for prisoners. Id. at para. 10-9. However, the Army is provided explicit flexibility by a provision in the regulation for "field expedient detention cells,” a provision that holds, inter alia, that "[d]etention cells used during field and combat operations will correspond to established ... standards to the maximum degree possible under existing conditions.”

. We note that para. 3-2.e, of AR Reg. 190-47 tracks the language of Article 12, UCMJ:
Incarceration with enemy prisoners of war. Members of the Armed Forces of the United States will not be incarcerated in immediate association with enemy prisoners of war (EPW) or other foreign nationals not members of the Armed Services of the United States, unless the EPW or foreign nationals are being detained under military control for suspected or proven criminal conduct.
We conclude that the stated exception in AR Reg. 190-47 is inapposite in this case.

. This Court recognizes that the term "immediate association” has been used in cases referring to Article 13, UCMJ, 10 U.S.C. § 813 (2000), and in particular when analyzing whether pretrial inmates were inappropriately held with convicted prisoners. In that context, “immediate association” was synonymous with “commingling.” See, e.g., United States v. Palmiter, 20 M.J. 90, 98 (C.M.A.1985) (Everett, C.J., concurring in the result). While informative, we find our use of the term in reference to Article 13, UCMJ, inapposite in our discussions of Article 12, UCMJ, for two reasons. First, the understanding that the prohibition on "commingling” is synonymous with "immediate association” has become moribund as this Court has followed civilian courts into looking at the intent of jailers, rather than the physical placement of inmates, in determining violations of Article 13, UCMJ. See id. at 95 (majority opinion). Second, Congress only saw fit to place "immediate association” in Article 12, UCMJ, suggesting that there were special concerns that it wished to address in this regard.

. The appellant's Article 12, UCMJ, claim was one of several he lodged in his habeas claim, which centered on his mistaken belief that the Naval Reviewing Authority did not have the power to change the location of his confinement. Kuykendall, 285 F.2d at 480-81. While rejecting the entirety of his petition, the reviewing court could find no evidence that any foreign nationals were incarcerated in the same facilities in which he was imprisoned (initially the United States Naval Disciplinary Barracks, Naval Operating Base, Terminal Island, San Pedro, California, and then the United States Disciplinary Barracks at Fort Leavenworth), let alone "in immediate association” to the appellant. Id. at 481. Regardless, the court's view on the meaning of Article 12, UCMJ, while not binding, is persuasive and instructive.

. Applying Ginn, and assuming Appellant’s affidavits are accurate, Appellant has not demonstrated that the conditions to which he was subjected were “sufficiently egregious” or amounted to unnecessary or wanton infliction of pain to give rise to the presumption that he was being impermissibly punished. Nor is there evidence that the Government intended to punish Appellant by confining him in "the cage” rather than a more formalized facility, or that the Government was "deliberately indifferent” to Appellant’s well-being in doing so. As a result, we do not find Article 55, UCMJ, or the Eighth Amendment implicated in Appellant’s placement in the confinement area in Tikrit. See United States v. Fischer, 61 M.J. 415, 423 (C.A.A.F.2005) (holding in the context of pretrial confinement that "sufficiently egregious” conditions can give rise to a *477 presumption that a detainee is being punished citing United States v. James, 28 M.J. 214, 216 (C.M.A.1989)); Palmiter, 20 M.J. at 95 (holding that improper intent by confinement officials can be determinative in finding violations of confinement conditions); Lovett, 63 M.J. at 216 (holding that an appellant must demonstrate that "officials knew and ... disregarded known risks to inmate safety” in order to show a violation of the Eighth Amendment (citing Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994))).

. We reach this conclusion without expressing a view as to the relative merits in this and other contexts of the government’s methods of complying with Article 12, UCMJ. Indeed, in this case our decision is based not on the facts as adjudicated, but on one side’s unrebutted affidavit examined consistent with Ginn.