UNITED STATES, Appellee and Cross-Appellant

v.

Michael C. MCPHERSON, Senior Airman
U.S. Air Force, Appellant and Cross-Appellee

Nos. 14-0348 and 14-5002

Crim. App. No. S32068

United States Court of Appeals for the Armed Forces

Argued June 4, 2014

Decided August 21, 2014

STUCKY, J., delivered the opinion of the Court, in which
ERDMANN, RYAN, and OHLSON, JJ., joined.  BAKER, C.J., filed a
separate opinion concurring in part and dissenting in part.


Counsel


For Appellant and Cross-Appellee:  Captain Thomas A. Smith
(argued); Major Zaven T. Saroyan.


For Appellee and Cross-Appellant:  Major Daniel J. Breen
(argued); Lieutenant Colonel C. Taylor Smith and Gerald R.
Bruce, Esq. (on brief).


Military Judge:  W. Shane Cohen


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. McPherson, Nos. 14-0348/AF & 14-5002/AF

Judge STUCKY delivered the opinion of the Court.

Article 12 of the Uniform Code of Military Justice (UCMJ) provides that: "No member of the armed forces may be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces." 10 U.S.C. § 812 (2012). The Judge Advocate General of the Air Force certified to this Court the question of whether Article 12, UCMJ, applies to members of the armed forces confined in a state or federal facility within the continental limits of the United States.[1] We also granted Senior Airman (SrA) McPherson's petition asking whether a confinee must exhaust administrative remedies before being entitled to relief under Article 12. Because Article 12 is clear on its face, we hold that it applies to military members confined in civilian state or federal facilities in the United States. We further hold that under Article 12, a confinee must exhaust his administrative remedies prior to judicial intervention.

---

[1] The certified issue is the same as the issue we specified for the United States Air Force Court of Criminal Appeals to consider on remand in United States v. Wilson, 72 M.J. 447 (C.A.A.F. 2013) (summary disposition). In that case, the lower court held that Article 12, UCMJ, does apply in such circumstances. United States v. Wilson, 73 M.J. 529, 531, 533 (A.F. Ct. Crim. App. 2014). The Air Force Judge Advocate General certified the same issue to this Court in both cases, and we considered them together.

United States v. McPherson, Nos. 14-0348/AF & 14-5002/AF

## I.  Posture

A military judge sitting as a special court-martial convicted SrA McPherson, pursuant to his pleas, of being absent without leave and distributing drugs.  Articles 86 and 112a, UCMJ, 10 U.S.C. §§ 886, 912a (2012).  The military judge also convicted him, contrary to his pleas, of fraudulent enlistment; another specification of being absent without leave; making a false official statement; wrongfully possessing and using drugs; and incapacitating himself for the performance of duties.  Articles 83, 86, 107, 112a, and 134, UCMJ, 10 U.S.C. §§ 883, 886, 907, 912a, 934 (2012).  The convening authority approved the sentence that the military judge adjudged:  a bad-conduct discharge, confinement for eight months, reduction to the lowest enlisted grade, and a reprimand.  The United States Air Force Court of Criminal Appeals (CCA) affirmed.  United States v. McPherson, 72 M.J. 862 (A.F. Ct. Crim. App. 2013) (reconsideration and reconsideration en banc denied on Jan. 6, 2014).

## II.  Background

After his conviction and sentence, SrA McPherson was initially confined for fifteen days at the Elmore County Detention Facility in Idaho.  Id. at 869.  SrA McPherson alleged to the CCA and before this Court that "for eight of those days, he was housed in an open bay with a foreign national known only

3

as 'The Mexican,' who was awaiting deportation hearings." Id. SrA McPherson and "The Mexican" played card games together every night while in confinement. Id.

SrA McPherson did not seek clemency from the convening authority for being confined in immediate association with an alleged foreign national, nor did he notify anyone at the confinement facility or in his chain of command, even after he was transferred to the Naval Consolidated Brig Miramar. Id. He first raised the issue in his appeal to the CCA. Id.

In its decision, the CCA did not specifically address whether Article 12, UCMJ, applies to military members confined in a state or federal facility within the United States. Rather, it evaluated whether relief for an alleged Article 12 violation is available where a confinee did not exhaust administrative remedies. Id. at 867-70. The CCA found "no 'unusual or egregious circumstance' to excuse [SrA McPherson's] failure to pursue available administrative remedies," and declined to grant relief. Id.

On December 9, 2013, the Government filed a motion for reconsideration and reconsideration en banc, alleging that, by employing an exhaustion of remedies analysis, the CCA had "implicitly establishe[d] as a matter of law in the Air Force that Article 12 applies to civilian confinement facilities." The CCA summarily denied the motion on January 6, 2014. The

4

United States v. McPherson, Nos. 14-0348/AF & 14-5002/AF

case is now before us on the Judge Advocate General's
certification.

III.  Certified Issue

"Interpreting Article 12, UCMJ, is an issue of statutory
interpretation, which we review de novo."  United States v.
Wise, 64 M.J. 468, 473 (C.A.A.F. 2007).

> As in all statutory construction cases, we begin with
> the language of the statute.  The first step is to
> determine whether the language at issue has a plain
> and unambiguous meaning with regard to the particular
> dispute in the case.  The inquiry ceases if the
> statutory language is unambiguous and the statutory
> scheme is coherent and consistent.

Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 450 (2002)
(citations and internal quotation marks omitted).  Whether the
statutory language is ambiguous is determined "by reference to
the language itself, the specific context in which that language
is used, and the broader context of the statute as a whole."
Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997).

Here, the text of Article 12 is plain on its face:  "No
member of the armed forces may be placed in confinement in
immediate association with enemy prisoners or other foreign
nationals not members of the armed forces."  There is no
geographic limitation by its terms, so this Court will not read
any such limitation into the plain language of the statute.
Rather, we "must presume that a legislature says in a statute
what it means and means in a statute what it says there."

5

United States v. McPherson, Nos. 14-0348/AF & 14-5002/AF

Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253–54 (1992). Article 12 applies to military members in state or federal confinement facilities without geographic limitation. "When the words of a statute are unambiguous, then, this first canon is also the last:  judicial inquiry is complete." Id. at 254 (citations and internal quotation marks omitted).

The Government claims that Article 12 conflicts with Article 58, UCMJ, 10 U.S.C. § 858 (2012), necessitating additional statutory interpretation.  Article 58 provides:

> [A] sentence of confinement adjudged by a court-martial . . . may be carried into execution by confinement in any place of confinement under the control of any of the armed forces or in any penal or correctional institution under the control of the United States, or which the United States may be allowed to use.  Persons so confined in a penal or correctional institution not under the control of one of the armed forces are subject to the same discipline and treatment as persons confined or committed by the courts of the United States . . . .

Emphasis added.

"'When a statute is a part of a larger Act . . . the starting point for ascertaining legislative intent is to look to other sections of the Act in pari materia with the statute under review.'"  United States v. Diaz, 69 M.J. 127, 133 (C.A.A.F. 2010) (alteration in original) (quoting United States v. McGuinness, 35 M.J. 149, 153 (C.M.A. 1992)); see also United Sav. Ass'n v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365, 371 (1988) (stating that statutory construction is a

6

"holistic endeavor").  Both Article 12 and Article 58 address treatment of military members in confinement:  Article 58 requires all confinees to be treated the same, and Article 12 requires that no military member may be confined in immediate association with a foreign national.  Arguing that Article 58's "same treatment" provision is more specific than Article 12, the Government asks us to apply the rule of statutory interpretation that, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act," Congress "intentionally and purposely" intended "the disparate inclusion or exclusion."  Bates v. United States, 522 U.S. 23, 29-30 (1997) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)) (internal quotation marks omitted).  The Government argues this rule means that the specificity of Article 58 must apply to Article 12 too.

But Article 58 is not more specific than Article 12, nor are the two statutes in conflict.  Military confinees can -- and must -- receive treatment equal to civilians confined in the same institution, while being confined separately from foreign nationals.  This Court has no license to generate a statutory conflict where none exists or to construe statutes in a way that "undercut[s] the clearly expressed intent of Congress."  United States v. Bartlett, 66 M.J. 426, 428 (C.A.A.F. 2008).  Article 12 and Article 58 were passed at the same time, and read in pari

7

materia, they both apply without conflict to military members confined in state or federal institutions in the United States.[2]

The Government responds that this holding generates "absurd results" for confinement conditions. See, e.g., Wilson, 73 M.J. at 534 (noting that the appellant was placed in solitary confinement to avoid a violation of Article 12 because the county jail where he was confined "ha[d] no system of identifying foreign nationals"). A confinee subject to solitary confinement in these circumstances might then raise a claim of a violation of Article 55, UCMJ, 10 U.S.C. § 855 (2012) (prohibiting cruel or unusual punishment).

The methods by which civilian facilities may enforce Article 12 are matters of policy and are not before this Court. Since solitary confinement is certainly not the sole method for implementing the requirements of the statute, the plain language of Article 12 does not dictate absurd results. Any such decisions come from fiscal decisions made by the military departments, not from the operation of the statute.

---

[2] We therefore disagree with the United States Court of Appeals for the District of Columbia Circuit, which held that "Article 58 trumps Article 12." Webber v. Bureau of Prisons, No. 02-5113, 2002 U.S. App. LEXIS 18796, at *2, 2002 WL 31045957, at *1 (D.C. Cir. Sept. 12, 2002) (per curiam). The D.C. Circuit found no precedential value in this opinion, however, and it has no precedential authority for this Court either. See Circuit Rules of the United States Court of Appeals for the District of Columbia, Circuit Rule 36(e)(2).

IV.  Granted Issue

In his petition, SrA McPherson argues that the CCA erred in holding that a confinee must exhaust administrative remedies before receiving any relief for a violation of Article 12, UCMJ.[3] We disagree and affirm the holding of the court below.

The CCA relied on Wise, 64 M.J. at 471, to hold that exhaustion of administrative remedies is a prerequisite to relief under Article 12.  McPherson, 72 M.J. at 869.  In Wise, this Court addressed an appellant's claim of being confined with enemy prisoners of war in Iraq in violation of both Article 12 and Article 55, UCMJ.  64 M.J. at 470.  The Court observed that a prisoner must exhaust administrative remedies in his detention facility before he can "invok[e] judicial intervention to redress concerns regarding post-trial confinement conditions," absent "some unusual or egregious circumstance."  Id. at 469, 471 (citing United States v. White, 54 M.J. 469, 472 (C.A.A.F. 2001); United States v. Miller, 46 M.J. 248, 250 (C.A.A.F. 1997)).  The Court's analysis, though, was in an Article 55 context.  Both White and Miller are Article 55 cases; neither mentions Article 12.  While the Wise Court did mention and analyze Article 12 elsewhere in the opinion, we did not clarify

_____

[3] SrA McPherson asserts that there is a split among service courts on this issue.  However, he cites no cases from the other services in support of this point and it appears that none of the other service courts has even addressed it.

United States v. McPherson, Nos. 14-0348/AF & 14-5002/AF

whether the exhaustion-of-administrative-remedies analysis sprang from Article 12 or solely from Article 55.  We now hold that a confinee must exhaust administrative remedies before judicial intervention for an Article 12 violation claim.

Article 12 regulates confinement conditions in a manner similar to Article 55's limitations on permissible confinement conditions.  See United States v. Pena, 64 M.J. 259, 265 (C.A.A.F. 2007) (taking note of Article 12's requirements in the context of discussing Article 55's prohibition of "cruel or unusual punishment"); United States v. Ellsey, 16 C.M.A. 455, 458, 37 C.M.R. 75, 78 (1966) (listing Article 12's provisions among the requirements for confinement conditions); cf. United States v. Palmiter, 20 M.J. 90, 96 (C.M.A. 1985) (indicating that Article 12 is applicable to pretrial confinement, and "commingling" under Article 12 is not punishment in and of itself).

Article 55 requires exhaustion of administrative remedies. United States v. Coffey, 38 M.J. 290, 291 (C.M.A. 1993) ("While Article 55 . . . prohibits [cruel or unusual] punishment, and under appropriate conditions we might exercise our power to issue an extraordinary writ, a prisoner must seek administrative relief prior to invoking judicial intervention.").  Consistent with Wise, we find that this exhaustion-of-remedies requirement is applicable under Article 12 as well.

There are practical and policy reasons to apply this requirement to Article 12 relief.  This administrative exhaustion requirement furthers two related goals:  (1) the "resolution of grievances at the lowest possible level" with "prompt amelioration" of the complaint while the prisoner suffers the condition, and (2) the development of an adequate record to aid appellate review.  Wise, 64 M.J. at 471 (citing Miller, 46 M.J. at 250).

This case demonstrates why these goals are so important. SrA McPherson did not raise this issue to local confinement officials or to anyone in his chain of command.  See id. at 472. During this time, though, he did learn of a process for filing complaints and also complained to his first sergeant that he was not receiving his prescription medications.  SrA McPherson did not raise the Article 12 issue in his clemency submissions to the convening authority, nor did he file a grievance with the confinement facility or make an Article 138, UCMJ, 10 U.S.C. § 938 (2012), complaint.  Since SrA McPherson did not complain of this condition until appeal, there are no details of his confinement conditions for an appellate court to review:  we know only that he alleges he was confined with a man he calls "The Mexican" who said he was awaiting deportation proceedings. "[T]he Air Force was unable to investigate the claims, make a record of it for review, or have the opportunity to immediately

11

correct the situation, as warranted." McPherson, 72 M.J. at 869.

Wise is still good law. To obtain relief for an Article 12 violation, a confinee must exhaust available administrative remedies absent unusual or egregious circumstances. In this case, SrA McPherson concededly did not exhaust his administrative remedies. The CCA did not err in finding no "unusual or egregious circumstance" to excuse his failure to exhaust remedies. Thus, SrA McPherson is not entitled to relief under Article 12.

## V. Decision

The judgment of the United States Air Force Court of Criminal Appeals is affirmed.

United States v. McPherson, Nos. 14-0348/AF & 14-5002/AF

BAKER, Chief Judge (concurring in part and dissenting in part):

I concur with the majority's judgment that to obtain relief for an Article 12, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 812 (2012), violation, a confinee must exhaust administrative remedies absent unusual or egregious circumstances.  As the Court in Wise stated, "[a] prisoner must seek administrative relief prior to invoking judicial intervention to redress concerns regarding post-trial confinement conditions."  United States v. Wise, 64 M.J. 468, 469 (C.A.A.F. 2007).  Exhaustion serves two purposes.  First, it is intended to effect "prompt amelioration of a prisoner's conditions of confinement."  Id. at 471.  Second, it allows development of an adequate record for appellate review where the confinement conditions are not redressed or the prisoner seeks additional redress.  See United States v. Miller, 46 M.J. 248, 250 (C.A.A.F. 1997).

I disagree, however, with the majority's conclusion regarding Article 12, UCMJ.  Read literally, Article 12, UCMJ, conflicts with Article 58, UCMJ, 10 U.S.C. § 858 (2012).  Therefore, one must look beyond the text of Article 12, UCMJ, to determine congressional intent.  That intent is clear:  on the one hand, to prevent the confinement of servicemembers in immediate association with enemy combatants and foreign

nationals in military detention, and, on the other hand, to
permit the transfer of servicemembers to federal prisons in
order to facilitate their rehabilitation and promote discipline
in military confinement facilities.  As a result, the majority's
literal application of the statutory text of Article 12, UCMJ,
produces a result demonstrably at odds with the intent of its
drafters and with Article 58, UCMJ.

This case provides an opportunity to invoke almost every
canon of statutory construction known to Sutherland.  2A N.
Singer & S. Singer, Sutherland Statutes and Statutory
Construction (7th rev. ed. 2014).  Three principles should
decide this case.  First, where congressional intent is not
clear, look to legislative history.  Second, read the statutory
scheme as a whole.  Third, do not reach an absurd result.
Applying these principles, I would hold that the plain language
of Article 12, UCMJ, compels an absurd result when read in
conjunction with equally clear language of Article 58, UCMJ.
While Article 12, UCMJ, prohibits confinement of a servicemember
in immediate association with a foreign national, Article 58,
UCMJ, requires that a servicemember in civilian confinement
receive the same treatment as his or her civilian counterpart.
It also expressly -- by design and with intent -- enables the
military to transfer servicemembers to federal facilities to
serve their prison sentences.  The majority's interpretation of

the law defeats this purpose in light of the number of foreign nationals in the general U.S. prison population both at the time of the passage of the UCMJ and today.

The majority pretends otherwise. Yet to comply with Article 12, UCMJ, servicemembers are assigned to solitary confinement in civilian confinement facilities, despite otherwise complying with prison rules and regulations, because the armed forces frequently use such facilities. See, e.g., Joshua R. Traeger, The Confinement of Military Members in Civilian Facilities, 39.1 A.F. Rep. 31, 33 (2012) ("[T]he use of local confinement facilities (vice facilities on base) is prevalent across the Air Force and, more specifically, Air Combat Command (ACC). An informal poll of ACC military justice sections revealed that about fifty percent of ACC wings utilize civilian confinement facilities for at least portions of their confinement operations."). Given the approximately 350,000 foreign nationals incarcerated in local jails and state and federal prisons, the majority, in neglecting to read the statutory language in its proper context, now makes it virtually impossible for the armed forces to make use of civilian confinement facilities, thus "undercut[ting] the clearly expressed intent of Congress in enacting" Article 58, UCMJ. United States v. Bartlett, 66 M.J. 426, 428 (C.A.A.F. 2008). By in effect requiring servicemembers to be in solitary

confinement, the decision also directly undermines the "rehabilitative" purpose of Article 58, UCMJ.

## Discussion

"In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." McCarthy v. Bronson, 500 U.S. 136, 139 (1991) (internal quotation marks and citation omitted); see also Crandon v. United States, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."). The Supreme Court has further stated:

> In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning -- or ambiguity -- of certain words or phrases may only become evident when placed in context. It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." A court must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," and "fit, if possible, all parts into an harmonious whole."

Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) (citations omitted). Supreme Court case law makes clear that a court should resort to legislative history if a literal reading of the statute would "impute[] to

4

Congress [a] contradictory and irrational purpose," United States v. Bryan, 339 U.S. 323, 338 (1950), "thwart the obvious purpose of the statute," In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 (1978) (citation omitted), or lead to a result "plainly at variance with the policy of the legislation as a whole," United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 543 (1940) (internal quotation marks and citation omitted). By resorting to textualism, the majority opinion will distort the design, object, and policy of the overall statutory scheme.

The United States Court of Appeals for the District of Columbia Circuit, the only other federal appeals court to address the issue, concluded in a unanimous decision, that Article 12, UCMJ, and Article 58, UCMJ, could not be harmonized. Although no more than persuasive authority, the analysis is compelling in its brevity and clarity. The D.C. Circuit had no difficulty applying the rules of statutory construction, summarily declining to review a lower court's dismissal of a complaint similar to the present action. Requiring only three sentences, the court held:

> Article 58 of the Uniform Code of Military Justice states categorically that military prisoners housed in Bureau of Prisons facilities shall be subject to the same treatment as their civilian counterparts. It does not create an exception concerning confinement with foreign nationals, nor does Article 12 of the Code provide that its prohibition against such confinement survives Article 58's same-treatment rule. Thus, by its terms, Article 58 trumps Article 12, and

5

> the district court properly dismissed the complaint
> for failure to state a claim.

Webber v. Bureau of Prisons, No. 02-5113, 2002 U.S. App. LEXIS 18796, at *2, 2002 WL 31045957, at *1 (D.C. Cir. 2002) (citations omitted).

The legislative histories of Articles 12 and 58, UCMJ, make obvious that the drafters, informed by the experience of the Second World War, intended for Article 12, UCMJ, to shield servicemembers from confinement with enemy prisoners of war and for Article 58, UCMJ, to allow confinement of servicemembers in federal prisons given their belief at the time in the civilian criminal justice system's superior expertise in providing rehabilitative services. There was no suggestion by Congress preceding the passage of Article 58, UCMJ, that it would be circumscribed by Article 12, UCMJ, surely a possibility likely to have been discussed given the confinement at the time of several thousand foreign nationals in U.S. civilian jails and prisons. See Dep't of Justice, Bureau of Justice Statistics, NCJ-102529, Historical Corrections Statistics in the United States 1850-1984 tbl.3-31 (1986). The result of the majority's interpretation of Article 12, UCMJ -- namely, that servicemembers will continue to be placed in solitary confinement in certain civilian facilities regardless of their behavior -- is not the absurd result the drafters anticipated or

6

desired given the rehabilitative purpose of Article 58, UCMJ. Moreover, in such gratuitous circumstances it may even conflict with the Eighth Amendment and Article 13, UCMJ, 10 U.S.C. § 863 (2012).

The majority asserts that "solitary confinement is certainly not the sole method for implementing the requirements of the statute." United States v. McPherson, __ M.J. __, __ (8) (C.A.A.F. 2014). However, this conclusion is not supported unless one assumes the armed forces will build more prisons. Never mind that Article 58, UCMJ, was intended to avoid that necessity by permitting transfer of military prisoners to the civilian criminal justice system. Nor does the majority explain how the same-treatment language and rehabilitative intent of Article 58, UCMJ, can be accomplished through the placement of military prisoners in solitary confinement as is clearly required in many, if not all, facilities, given the number of foreign nationals -- 350,000 -- currently confined in U.S. prisons. U.S. Gov't Accountability Office, GAO-11-187, Criminal Alien Statistics: Information on Incarceration, Arrests, and Costs (2011). Solitary confinement, or segregated confinement, is the only way to comply with Article 12, UCMJ, in most if not

all civilian facilities.[1]  The majority has not demonstrated otherwise.

    To be sure, Article 12, UCMJ, expressly prohibits servicemembers from being "placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces."  A literal reading of the article has thus led a lower court to grant confinement credit to a servicemember for several days' detention in a cell next to that of a Spanish-speaking inmate in North Dakota.  United States v. Towhill, No. ACM 37695, 2012 CCA LEXIS 94, at *7-*8, 2003 WL 1059015, at *3 (A.F. Ct. Crim. App. Mar. 16, 2012) (unpublished).  Such a result is entirely at odds with Congress's intent in enacting Article 12, UCMJ.  The legislative history demonstrates the overriding purpose of Article 12, UCMJ, was to prohibit confinement of a servicemember in the same cell with a foreign national, particularly one engaged in military service, in times of war.

---

[1] See Traeger, supra p. __ (3), at 33 (describing how the admission of a single migrant worker to Cook County Jail, Georgia, which is "approximately 2000 square feet in size, with a bay-style general population area, a seventy-square-foot segregation cell, a small gym, administrative offices and minimal outdoor space," requires that servicemembers be "moved to the seventy-square-foot segregation cell" and "sometimes . . . [when the] general population is filled with three to four migrant workers . . . the tiny segregation cell houses one, two or even three military members at a time (the third sleeping on the floor)").

The precursor to Article 12, UCMJ, Article of War 16, stated:

> No person subject to military law shall be confined
> with enemy prisoners or any other foreign nationals
> outside of the continental limits of the United States,
> nor shall any defendant awaiting trial be made subject
> to punishment or penalties other than confinement prior
> to sentence on charges against him.

Manual for Courts-Martial, U.S. Army app. 1 (1949 ed.) (MCM).

By the time Congress voted to pass the Uniform Code of Military Justice, in 1950, the text now codified as Article 12, UCMJ, provided:  "No member of the armed forces of the United States shall be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces of the United States."  Uniform Code of Military Justice, ch. 169, art. 12, 64 Stat. 107, 112 (1950) (current version at 10 U.S.C. § 812 (2012)).  The language changed only insofar as "confined with" was replaced by "in immediate association with" and "outside the continental limits of the United States" was removed.  The commentary to Article 12, UCMJ, described the first revision as necessary to allow confinement of prisoners of war in a brig on an American naval vessel:

> A[rticle] [of] W[ar] 16 could be interpreted to
> prohibit the confinement of members of the armed
> forces in a brig or building which contains prisoners
> of war.  Such construction would prohibit putting
> naval personnel in the brig of a ship if the brig
> contained prisoners from an enemy vessel.  This

9

> Article is intended to permit confinement in the same
> guardhouse or brig, but would require segregation.

See Uniform Code of Military Justice:  Hearings on H.R. 2498 Before a Subcomm. of the H. Comm. on Armed Servs., 81st Cong. 914 (1949), reprinted in Index and Legislative History, Uniform Code of Military Justice (1950) (not separately paginated) [hereinafter Legislative History].

Thus the emphasis was entirely on avoiding confinement of servicemembers with "enemy" prisoners.  The prominence of this feature of the legislation was borne out in remarks by legislators and staff members during a hearing before a subcommittee of the House Committee on Armed Services.  A professional staff member, Robert W. Smart, described that the purpose of Article 12, UCMJ, was "to be sure that American boys were not confined with prisoners of war or other enemy nationals," to which the vice chairman of the subcommittee, Representative L. Mendel Rivers, replied, "[l]ike happened [sic] during the war."  Id.  Later Felix E. Larkin, an assistant general counsel in the Department of Defense, elaborated on the reason for the change:

> Now we have changed the wording and said --
> "No member shall be placed in confinement in immediate
> association --"
>
> because as it read it conceivably could cause a number
> of confinement difficulties.

10

> . . . The service might have a difficult time overseas if they could not confine a person with enemy prisoners in that they could not even keep them in the same jail.
>
> There may not be more than one jail or place of confinement within the area. Then they just could not restrain them or confine them at all.
>
> We thought we kept the sense of the present law but made it a little more flexible by saying "in immediate association" which in effect would mean you could keep them in the same jail by at least segregating them in different cells. It further was proposed for the Army, with no thought of the Navy -- the Navy you can visualize might have a great difficulty aboard the ship when they captured an enemy vessel and took foreign nationals.
>
> Then they could not keep any offender of their own in the same brig on ship board. We have changed that.

Id. at 914-15. The second revision striking the geographical limitation was explained only to this extent, and not entirely lucidly, also by Mr. Larkin:

> We have deleted, if you will notice, "outside the continental limits" and made it apply everyplace [sic], but prohibit incarceration in close association but not with [sic] because "with" has the connotation that you could not keep them in the same prison and there may be only one. They are the only differences between what is in the law now and this article.

Id. at 915.

No one offered further justification for the modification. No one posited or discussed the article's application to confinement of servicemembers in civilian facilities in the United States.

11

So too the legislative history of Article 58, UCMJ, which was passed in conjunction with Article 12, UCMJ, suggests Congress neither intended nor desired for servicemembers in civilian confinement to be separated from foreign-born residents of the United States, such as migrant workers, who are not enemies of or hostile to the government. Article 58(a), UCMJ, provides:

> [A] sentence of confinement . . . may be carried into execution by confinement in any place of confinement under the control of any of the armed forces or in any penal or correctional institution under the control of any of the armed forces or in any penal or correctional institution under the control of the United States . . . . Persons so confined in a penal or correctional institution not under the control of one of the armed forces are subject to the same discipline and treatment as persons confined or committed by the courts of the United States or of the State, District of Columbia, or place in which the institution is situated.

Article 58, UCMJ, derives from Article of War 42 and Article for the Government of the Navy (A.G.N.) 7. Article 58, UCMJ, is broader than those articles in that it provides authority for all branches of the armed forces to transfer a servicemember to civilian confinement for any offense. The commentary described the reason for the modification:

> Subdivision (a) is derived from A.G.N. article 7 which permits the Navy to transfer court-martial prisoners to institutions under the control of the Department of Justice. The Navy has found this practice to be beneficial both to the service and to the prisoner. Both the Army and Navy officers in charge of correctional policies recommend the adoption of subdivision (a). It is the policy of the armed forces

12

> to segregate youthful and rehabilitable prisoners from
> the hardened criminals and incorrigibles and to
> provide for the maximum rehabilitation of prisoners
> for the purpose of restoration to duty or successful
> adjustment in civil life.  However, due to lack of
> facilities and personnel with long and continuous
> experience in the highly technical and specialized
> phases of penology, the armed forces have serious
> handicaps in dealing with prisoners with long civilian
> criminal records, criminal psychopaths, sex deviates,
> violent incorrigibles and other prisoners requiring
> special treatment.  The Army in operating under A.W.
> 42 has met with great difficulty in segregating the
> varied types of prisoners and in giving them
> specialized treatment.  It is felt that the
> rehabilitation of prisoners who create special
> problems could be expedited by transferring them to
> the highly specialized institutions under control of
> the Department of Justice, which range from training
> schools and reformatories to major penitentiaries and
> provide for the treatment of prisoners according to
> their needs.
>
> From past experience, the services have found
> that the type of treatment suited for individuals does
> not depend on the type of offense or on the length of
> the sentence.  Many of the prisoners who cause special
> problems in disciplinary barracks are those convicted
> of military offenses, such as a.w.o.l. or desertion.

Legislative History, supra pp. __ (9-10), at 1093-94.  The

legislative history also contains testimony by military

officials stating that a primary goal of Article 58, UCMJ, was

to facilitate the reentry of recalcitrant servicemembers into

the armed forces by providing them access to the rehabilitative

services of the civilian prison system.  According to the

statement of Colonel Lloyd R. Garrison, Chief of the Correction

Branch of the Adjutant General's Office:

We feel that rehabilitation in prisons, to get people back in civil life, able [sic] to make their own living, is extremely important.

The populations of Army disciplinary barracks include prisoners of all types, ranging from youthful, impressionable first offenders to men with long civilian criminal records, criminal psychopaths, sex deviates, and violent incorrigibles. Adequate segregation for purposes of protecting young, impressionable offenders from detrimental influences and unwholesome contacts with the criminal types mentioned, and the operation of suitable rehabilitation programs to fit the varying needs of the individuals concerned cannot be accomplished in an institution in which all types are confined together. It is, therefore, considered desirable to provide for the confinement of different types of general prisoners in separate institutions having adequate facilities, trained personnel, and rehabilitation programs designed to meet the needs of the particular groups.

The Department of the Army does not have the number and diversified types of confinement facilities under its jurisdiction to provide for completely adequate segregation, control, and rehabilitative treatment of general prisoners by type. Further, military personnel assigned to duty at Army disciplinary barracks are subject to frequent rotation, and do not have the opportunity to gain the maturity of experience and training in the highly specialized professional and technical work involved in the administration of major correctional institutions, and in the control and treatment of the types of offenders involved. It would not be economical or in keeping with the primary mission for the Department of the Army to operate the number and types of institutions and provide the trained personnel required to meet these needs.

. . . .

In addition, it is considered desirable that the Department of the Army have access to the specialized facilities of the Federal Prison System for the rehabilitative treatment of individual offenders where

14

> transfer to such Federal institutions would result in benefit to the prisoner, such as transfer of medical and mental patients to the Medical Center for Federal prisoners, and transfer of some youthful offenders to the National Training School and Federal reformatories.

Id. at 1095.

Similarly, Captain Maginnis, the counterpart to Colonel Garrison in the Department of the Navy, testified:

> All that [Colonel Garrison] said about the facilities in Federal institutions for the treatment of these individuals who have committed felonies and who remain for long terms is true.
>
> In the naval service our personnel manning these institutions are men who enlisted in either the Navy or the Marine Corps as a career and to whom custodial work is not a chosen vocation. They do the best that they can, but we feel that the treatment the individual would obtain under Federal jurisdiction is much better when they are guided by those people who have that as their vocation and their life work.

Id. at 1106. None of the debate surrounding Article 58, UCMJ, contemplated that the "same discipline and treatment" requirement would or should be curtailed by Article 12, UCMJ. It does, however, make overwhelmingly clear that Congress sought to provide to the armed forces an avenue for confining servicemembers in civilian facilities and that that option was not to be limited. In ignoring this legislative history and the modern context, the majority defeats the purpose of Article 58, UCMJ, by preventing the armed forces from making use of civilian

confinement facilities as the drafters so clearly intended.  For these reasons, I respectfully dissent.