# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39590**

———————————

**UNITED STATES**
*Appellee*

**v.**

**David R. KANE**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 20 August 2020

———————————

*Military Judge:* Donald R. Eller, Jr. (arraignment); Bradley A. Morris.

*Approved sentence:* Dishonorable discharge, confinement for 34 months, and reduction to the grade of E-1. Sentence adjudged 27 August 2018 by GCM convened at Scott Air Force Base, Illinois.

*For Appellant:* Major Rodrigo M. Caruço, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Major Peter F. Kellett, USAF; Mary Ellen Payne, Esquire; Deniz Gunaydin (civilian intern).[1]

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Chief Judge J. JOHNSON and Senior Judge POSCH joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

---

[1] Mr. Gunaydin was a legal intern with the Air Force Legal Operations Agency and was at all times supervised by attorneys admitted to practice before this court.

KEY, Judge:

A military judge sitting as a general court-martial convicted Appellant, in accordance with his pleas pursuant to a pretrial agreement (PTA), of four specifications of attempted sexual abuse of a child in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880, and one specification of possession of child pornography in violation of Article 134, UCMJ, 10 U.S.C. § 934.[2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 34 months, reduction to the grade of E-1, forfeiture of all pay and allowances, and a reprimand. The convening authority disapproved the forfeitures and the reprimand but approved the remainder of the adjudged sentence, waiving a portion of the automatic forfeitures for the benefit of Appellant's dependent spouse and children.

On appeal, Appellant personally raises 16 issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Appellant asserts: Government agents entrapped him; his convictions are factually and legally insufficient; the Government conducted unlawful searches and seizures (Appellant alleges these as five separate errors); his speedy trial rights were violated; the Government charged him with an uninvestigated offense; the military judge erred in permitting expert testimony; the military judge erred in shifting the burden of proof to Appellant; his sentence was inappropriately severe; trial counsel made improper comments during the Government's sentencing argument; he was subjected to illegal post-trial punishment; the convening authority took action prior to Appellant receiving a copy of the record of trial; and his trial defense counsel provided him ineffective assistance. Although not raised by Appellant, we consider whether he is entitled to relief for facially unreasonable post-trial delay.

In light of Appellant's claims of ineffective assistance of counsel, we ordered trial defense counsel to provide declarations responding to his allegations.[3] Upon review of those declarations and Appellant's original brief, we specified an issue for the parties to brief and ordered supplementary declarations from trial defense counsel, discussed in further detail below.

Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings and sentence.

---

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ), the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] *See United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997).

## I. BACKGROUND

An Air Force Office of Special Investigations (AFOSI) agent placed an online advertisement in July 2017 seeking military men to "kick it wit."[4] Appellant responded to the advertisement and started an online conversation with "Courtney," the persona the agent had adopted. "Courtney" told Appellant, "I'm ynger so u prolly aren't interested but thanks for responding." Appellant told her he goes by "Big Daddy," to which "Courtney" responded, "I'll be 15 in dec." The two continued their conversation—which promptly became sexually explicit—for about a week via phone-based text messages, during which time Appellant sent a picture of his face and a picture of his naked torso with his hand partially obscuring his genitals along with two links to pornographic images. In the ensuing investigation, several of Appellant's electronic items were seized and subsequently searched, resulting in the discovery of ten images of child pornography on Appellant's mobile phone and another four images on his laptop computer.[5]

Appellant pleaded guilty unconditionally and stipulated to the facts underlying the offenses he was charged with. Pursuant to his PTA, Appellant agreed, *inter alia*, to "waive all motions which may be waived under the Rules for Courts-Martial."

## II. DISCUSSION

### A. Issues Waived by Appellant

Appellant providently pleaded guilty to the charged offenses. During his plea inquiry, Appellant explained that even after learning "Courtney" was 14 years old, he continued to communicate with her, the communications became sexual in nature, he initiated the sexual comments, and the comments were indecent. Appellant admitted to sending "Courtney" links to pornographic images along with the picture of himself in which his genitals are partially visible, and he likewise admitted to possessing images of child pornography. Appellant—under oath—told the military judge he believed "Courtney" was a 14-year-old child, he could have avoided engaging in the behavior if he had wanted to, and that he did not have any legal justification or excuse for what he did.

In addition to telling the military judge why he was guilty of the charged offenses, Appellant stipulated that he "fully believed that the individual he was speaking with was a 14-year-old female child." He also stipulated that the

---

[4] All text messages are transcribed verbatim from the evidence admitted at trial.

[5] Investigators found several hundred images of potential child pornography on Appellant's electronic devices, but Appellant pleaded guilty to possessing just 14 images.

search authorization used to seize his electronic media was valid and that 14 images found constituted child pornography. He stipulated to having other conversations online with unknown people in which Appellant discussed both viewing child pornography and a particular website known to contain child pornography, as well as to the fact he had collected a number of "memes" related to "jailbait" which featured images of girls—many in sexualized dress and poses—with captions such as, "because the best things in life are illegal" and "15 will get you 20."

Appellant's unconditional guilty plea waived his claims on appeal that his conviction was factually insufficient or that he had a valid defense of entrapment. Rule for Courts-Martial (R.C.M.) 910(j); *United States v. Schweitzer*, 68 M.J. 133, 136 (C.A.A.F. 2009). Appellant's post-trial assertions that he was not actually guilty of the offenses he pleaded to—whether due to his new claims of mistake of fact as to "Courtney's" age, being purportedly entrapped, voluntarily abandoning his text conversation with her, or not actually possessing child pornography—do not serve to undermine his guilty pleas. *United States v. Wilson*, 44 M.J. 223, 225 (C.A.A.F. 1996).

In general, an "unconditional plea of guilty waives all nonjurisdictional defects at earlier stages of the proceedings." *United States v. Hardy*, 77 M.J. 438, 442 (C.A.A.F. 2018) (quoting *United States v. Lee*, 73 M.J. 166, 167 (C.A.A.F. 2014)) (additional citations omitted). When an appellant "intentionally waives a known right at trial, it is extinguished and may not be raised on appeal." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (citation omitted). An appellant "may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995). As a result, Appellant's unconditional pleas waived his post-trial challenges regarding the seizures and related searches of his electronic media as well as his allegation that there was some impropriety in the fact members of his unit were involved in obtaining evidence from him.

Appellant raises speedy-trial claims under R.C.M. 707, the Sixth Amendment,[6] and Article 10, UCMJ, 10 U.S.C. § 810. His unconditional guilty plea waived his R.C.M. 707 and Sixth Amendment claims. R.C.M. 707(e); *United States v. Tippit*, 65 M.J. 69, 75 (C.A.A.F. 2007). Because Appellant did not litigate a motion at his trial under Article 10, UCMJ, 10 U.S.C. § 810, his assertion of a speedy trial violation under that authority is also waived. *See United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F. 2005).

Even in the face of waiver, the Courts of Criminal Appeals are empowered under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to consider claims otherwise

---

[6] U.S. CONST. amend. VI.

waived as part of our obligation to affirm only such findings and sentences which are correct in law and should be approved. *See United States v. Chin*, 75 M.J. 220, 222–23 (C.A.A.F. 2016). We have reviewed the entire record, and we have found no substantial conflict between Appellant's pleas, his statements at trial, and the evidence of record; we therefore decline Appellant's invitation to reject his pleas or to otherwise pierce his waivers under our Article 66(c), UCMJ, authority. *See United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996).

## B. Issues Warranting Summary Discussion

Appellant raises three issues we will only briefly discuss, as they are without merit.

First, Appellant complains he was investigated for "indecent language to a minor," but he was ultimately charged with attempted sexual abuse of a child. Appellant's assertion appears rooted in the fact the AFOSI report of investigation attached to the preliminary hearing officer's report includes a discussion of the elements of proof for "indecent language to a child under 16 before 28 Jun 12." Even if we were to conclude AFOSI agents conducted their investigation based upon one particular provision of law, we know of no reason why Appellant could not be charged with committing an offense under an entirely different punitive article of the UCMJ based upon a legal review of the actual evidence uncovered during the investigation. Appellant neither cites applicable law to the contrary nor presents a cogent argument that the Government took any inappropriate action in this regard.

Second, Appellant asserts the military judge erred in "allowing improper expert testimony" during his court-martial. Yet, no witnesses testified during Appellant's trial, expert or otherwise. Trial defense counsel offered matters from the Defense's forensic psychologist consultant which the military judge agreed to consider in part, over government objection. To the extent Appellant is arguing the images he possessed were not actually of minors, Appellant stipulated that the children in the images were minors and that both the Government's and the Defense's expert pediatrician consultants agreed, and we see no valid issue with Appellant's decision to stipulate to those matters. Appellant has failed to identify any expert testimony in his case, and our review has disclosed none.

Third, Appellant contends the military judge allowed the Government to shift the burden of proof, forcing Appellant to prove his innocence. By pleading guilty, however, Appellant affirmatively absolved the Government of its obligation to prove his guilt. The military judge twice asked Appellant if he understood he had the moral and legal right to plead not guilty, thereby forcing the Government to prove his guilt beyond a reasonable doubt. Appellant told the

military judge he understood both times and that he wanted to plead guilty. Appellant's burden-shifting claim has no merit.

## C. Sentence Severity

We review sentence appropriateness de novo by "considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). Sentence comparison with other cases is only called for in "those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (citations omitted). Appellant has the burden of establishing other cases are both "closely related" (for example, when they involve co-actors, a common scheme, or other direct nexus) and that his sentence is "highly disparate." *Id.* Only when Appellant meets his burden must the Government "show that there is a rational basis for the disparity." *Id.*

Appellant lists a number of cases involving similar offenses, but he fails to demonstrate that they are closely related to his case. Instead, they appear to be a sampling of appellate rulings with only general references to charged offenses arising from other instances of military personnel interacting with law enforcement agents posing as children. Appellant does not allege—and we see no indication—either that he was a co-actor in any of these cases or that he was involved with the other accused in any common scheme. Similarly, we see no direct nexus between any of the cases Appellant cites and his case (or even each other). Even if we were to assume the 17 cases cited by Appellant are closely related, we note the sentences in those cases range from 100 days of confinement to 36 months, and all involved a punitive discharge (12 dishonorable discharges, 4 bad-conduct discharges, and 1 dismissal), placing Appellant's sentence to 34 months of confinement and a dishonorable discharge within that range. Notably, Appellant, who had received nonjudicial punishment under Article 15, UCMJ, 10 U.S.C. § 815, for an adulterous relationship with a junior Airman just a year prior to the conduct for which he was tried, did not approach his court-martial with a clean record—a point the military judge likely considered when assessing Appellant's rehabilitative potential. Appellant further conceded the appropriateness of a punitive discharge at trial, and he was sentenced to far less time than the five years of confinement his pretrial agreement limited the convening authority to—a strong indication even Appellant himself believed he faced a significant sentence to confinement.

Considering the foregoing and all matters within the record of trial to include Appellant's record of service, we conclude Appellant's sentence is not inappropriately severe.

**D. Trial Counsel's Sentencing Argument**

We review claims of improper sentencing argument de novo. *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017) (citing *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014)). Argument is improper when it is erroneous and it prejudices the substantial rights of the accused. *Frey*, 73 M.J. at 248. When trial counsel makes improper sentencing argument, the question is "whether or not we can be 'confident that [the appellant] was sentenced on the basis of the evidence alone.'" *Id.* (quoting *United States v. Halpin*, 71 M.J. 477, 480 (C.A.A.F. 2013)).

During his sentencing argument, trial counsel discussed Appellant's "escalation" of the explicit nature of his conversation with "Courtney." He then argued:

> But Your Honor, there's more to this escalation. Let's think back to his Article 15. In his Article 15, his nonjudicial punishment, he was demoted for having an adulterous relationship with another Airman. Here we have a sex crime. A sex crime in the military and he was demoted. Yet, that did not teach him anything. It didn't teach him that what he was doing was illegal. So, we go from there to possessing child pornography, 14 images.

Trial defense counsel did not object to this portion of the argument, but he did object when trial counsel argued shortly thereafter, "We don't have him stopping even though he has been previously demoted for a sex crime." Trial defense counsel said he objected "to the characterization of adultery as a sex crime." The military judge did not explicitly rule on the objection, but said, "I will give it the weight it's due. Argument of counsel is not facts." In his argument, trial defense counsel argued there was no evidence "of some sort of long-standing escalation of sex crimes."

We find no error with respect to trial counsel's argument. Appellant's prior nonjudicial punishment was a proper matter for trial counsel to obtain and introduce during sentencing proceedings. R.C.M. 1001(b)(2). Contrary to Appellant's argument, adultery is a crime under the UCMJ, and sexual intercourse is an element of that offense. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 62.b.(1). In other words, adultery is in fact a "sex crime." We recognize the offense of adultery, which typically connotes sexual activity between consenting adults, is not particularly analogous to attempted sexual abuse of a child, but a poor analogy renders an argument ineffective, not improper. Even if we were to find trial counsel's argument improper, we would conclude Appellant suffered no prejudice, as he was sentenced by a military judge sitting alone, and we presume military judges know and follow the law in the absence of clear evidence to the contrary. *United States v. Erickson*,

65 M.J. 221, 225 (C.A.A.F. 2007) (citing *United States v. Mason*, 45 M.J. 483, 485 (C.A.A.F. 1997)). We see no indication or plausible argument the military judge was so swayed by trial counsel's two references to a "sex crime"—especially in light of trial defense counsel pointing out there was no evidence of escalating sex crimes—that he sentenced Appellant on anything other than the evidence in his case.

Appellant further asserts trial counsel's argument was improper because it referred to the "dark web." Trial counsel pointed to Appellant's online discussions with others about finding child pornography on the internet and said, "So, we have somebody who is joking about child pornography, now in dark web forums about child pornography." Later, when arguing Appellant should be sentenced to a dishonorable discharge because it would serve a "deterrence" purpose, trial counsel said, "For him, if he feels the temptation to get back online to go from what everyone else is doing when they are searching online, going to Amazon or something, and going over into that dark web, he needs to be reminded that he was dishonorably discharged from the Armed Forces." Trial defense counsel did not object to either reference.

Appellant's complaint on appeal is that trial counsel was asserting Appellant was accessing the portion of the Internet known as "the dark web," of which there was no evidence. We agree there was no evidence Appellant accessed the actual dark web, but there was also no evidence in Appellant's trial about the dark web at all. Other than the two references above, trial counsel did not argue Appellant was utilizing any underground or hidden part of the Internet or that he was taking any particular actions to cloak his Internet activity. Placed in that context, trial counsel's references can be more accurately read as comments about Appellant visiting "dark"—as in seedy or squalid—areas of the Internet, which is a fair description of online repositories of child pornography and discussion forums featuring conversations about the same. We find no error respecting these two comments, and even if we did, we would find no prejudice for the same reasons we reached our conclusion regarding trial counsel's "sex crime" references.

### E. Post-Trial Confinement Conditions

Appellant asserts his post-trial confinement conditions amounted to a violation of his Eighth Amendment rights.[7] He was confined for approximately one month at Scott Air Force Base, Illinois, before he was transferred to the Naval Consolidated Brig in Miramar, California.

---

[7] U.S. CONST. amend. VIII.

With respect to his incarceration in the first facility, Appellant alleges he was subjected to an anal cavity search involving physical penetration of his anus during intake processing without any showing of probable cause.[8] This search was conducted by a physician as part of a search for contraband, and Appellant acknowledges he neither complained about nor objected to the search. He further alleges he was kept in "de facto isolation" the entire time, because there were no other prisoners in the facility while he was there. Appellant complains he was escorted to medical appointments and was shackled when away from the confinement facility, and he seems to complain he had inadequate access to entertainment, pointing out he could only use the television ("with an antenna") and radio on Sundays, and was otherwise left with a dysfunctional exercise bicycle and a "small library of donated books to read" (45 of which he says he read).

Regarding the second facility, Appellant asserts he was not able to keep his uniform parka since the facility only authorized fleece jackets, and that he only received an ill-fitting fleece after three months and a proper-fitting one the month after that. Appellant says the medical staff at Miramar took him off a heart medication another provider had previously prescribed him. He takes issue with the food service at the facility, specifically that they frequently run out of certain items, such as cereal, "condiments, coffee, milk, Pepsi syrup almost every day, . . . dessert, yogurt, . . . and pizza." Appellant notes that this complaint "may sound petty," but when the facility runs out of these items, "it reduces [prisoners'] morale." Appellant says the facility staff will not let him "self-medicate" his migraine headaches with "dark room rest," and that he "likely [has] ADHD or Type 1 Bi-polar disorder," which he does not believe is being adequately treated. He complains that the jail library and the chapel library were both closed for a few months due to investigations surrounding R-rated movies being found in inmates' cells and prisoners' personal property being found in the chapel. Finally, he says the facility staff members "routinely make up rules on the spot for anything they feel [the prisoners] shouldn't do" and that he received a disciplinary report "under trumped up circumstances with zero chance of being proven innocent."

---

[8] Appellant also alleges this conduct violated his rights under the Fourth Amendment, U.S. CONST. amend. IV. Because there is nothing in the record regarding these allegations, we are not permitted to consider the information submitted by Appellant for a Fourth Amendment analysis. *See United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020). In any event, because no evidence was seized as a result of this search, the ordinary remedy of the exclusionary rule would provide Appellant no relief. *See, e.g., United States v. Wicks*, 73 M.J. 93, 103 (C.A.A.F. 2014). Thus, our analysis focuses on the alleged Eighth Amendment violation.

We review de novo whether an appellant has been subjected to impermissible post-trial confinement conditions in violation of the Eighth Amendment. *United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001)). "[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)). As the Supreme Court has explained, "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

A violation of the Eighth Amendment is shown by demonstrating:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [an appellant]'s health and safety; and (3) that [an appellant] "has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ . . . ."

*Lovett*, 63 M.J. at 215 (first omission in original) (footnotes omitted) (quoting *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997)).

"[A] prisoner must seek administrative relief prior to invoking judicial intervention" with respect to concerns about post-trial confinement conditions. *Wise*, 64 M.J. at 471 (alteration in original) (quoting *White*, 54 M.J. at 472). "This requirement 'promot[es] resolution of grievances at the lowest possible level [and ensures] that an adequate record has been developed [to aid appellate review].'" *Id.* (alterations in original) (quoting *Miller*, 46 M.J. at 250); *see also United States v. McPherson*, 73 M.J. 393, 397 (C.A.A.F. 2014). "Absent some unusual or egregious circumstance," an appellant must both exhaust the grievance system at the confinement facility as well as petition for relief under Article 138, UCMJ, 10 U.S.C. § 938. *Wise*, 64 M.J. at 471 (quoting *White*, 54 M.J. at 472).

Appellant failed to establish the prison officials have acted with deliberate indifference towards his health and safety or that he was denied "the minimal civilized measure of life's necessities." *United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).[9] To the

---

[9] Body cavity searches do not ordinarily amount to cruel and unusual punishment under the Eighth Amendment unless they are carried out "maliciously or for the purposes

contrary, Appellant has established the degree of deprivation that is to be expected in an incarcerated setting. Appellant generally alleges he received inadequate health care, but has not identified any condition he has been diagnosed with or explained how his health care has fallen short of what is constitutionally required. We also note Appellant explains his migraine medicine dosage was sharply increased at his request, and he has not asserted this change in dosage did not resolve that medical issue.

Significantly, Appellant does not assert, and we see no evidence in the record, that he sought redress under either the confinement facilities' grievance systems or Article 138, UCMJ. Appellant made no reference to his confinement conditions in his clemency submission to the convening authority, and there is nothing in the record indicating he raised any of the above issues through command channels by any means. Appellant has not identified any unusual or egregious circumstances interfering with his ability to either exhaust the grievance systems or petition for relief. *See Wise*, 64 M.J. at 471. Appellant has not offered any reason at all for not utilizing either of those two avenues, and we have not found any in our review of the record. As a result, Appellant is entitled to no relief for his alleged Eighth Amendment violations.[10]

## F. Post-Trial Processing

Appellant argues the convening authority took action before Appellant was served with the record of trial. Appellant is correct, although we find he suffered no prejudice.

Appellant's court-martial concluded on 27 August 2018 and his trial defense counsel completed a review of the transcript of the proceedings on 27 September 2018. The record of trial was authenticated on 30 September 2018.

---

of sexually abusing an inmate." *Parkell v. Danberg*, 833 F.3d 313, 336 (3d Cir. 2016) (quoting *Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015)); *see also King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) (per curiam). Appellant does not allege the search was carried out for any reason other than to search for contraband, which we recognize as a legitimate penological purpose.

[10] Arguably, because Appellant raises his complaints about confinement for the first time on appeal, we are precluded from supplementing the record to determine if the sentence is appropriate and "should be approved," Article 66(c), UCMJ, 10 U.S.C. § 866(c), as observed recently in this court's decision in *United States v. Matthews*. No. ACM 39593, 2020 CCA LEXIS 193, at *13–15 (A.F. Ct. Crim. App. 2 Jun. 2020) (unpub. op.); *see also Jessie*, 79 M.J. at 444. Even if we are not precluded from supplementing the record, Appellant has failed to identify a legal deficiency that would give rise to this court granting relief under our Article 66(c), UCMJ, authority to approve only so much of the sentence that, based on "the entire record, should be approved." 10 U.S.C. § 866(c); *see United States v. Ferrando*, 77 M.J. 506, 517 (A.F. Ct. Crim. App. 2017); *United States v. Gay*, 75 M.J. 264, 269 (C.A.A.F. 2016).

On 22 October 2018, the staff judge advocate's written recommendation was completed and served on trial defense counsel the same day. Although this recommendation was required to be served on Appellant prior to it and the record of trial being forwarded to the convening authority for action pursuant to R.C.M. 1106(f)(1), Appellant did not receive a copy of the recommendation until 26 November 2018, six days after the convening authority took action on his case.

Trial defense counsel received a copy of the record of trial on 30 October 2018, but Appellant did not, despite trial counsel's responsibility for serving a copy of the record of trial on the accused as soon as it is authenticated. R.C.M. 1104(b)(1)(A). Nonetheless, trial defense counsel submitted matters in clemency under R.C.M. 1105 on 11 November 2018, including a letter from Appellant dated 1 November 2018. Both Appellant's letter and a memorandum from his trial defense counsel requested the convening authority provide financial relief for Appellant's family through deferment and waiver of portions of his sentence. Nothing in the clemency submission asserted any error arising out of the court-martial or any concerns regarding post-trial punishment.

On 20 November 2018—the same date the convening authority took action—the servicing legal office sent an email to trial defense counsel explaining they had learned the confinement facility rejected receipt of Appellant's record of trial due to it arriving when no legal representative was "on-site." The email further acknowledged the convening authority had taken action before Appellant received his record of trial and asked if Appellant would like to submit additional matters to the convening authority for him to consider. Trial defense counsel wrote back the same day, "our understanding is that AB Kane will stand by his original clemency submission. If we learn otherwise, we will inform you ASAP."

Only when it is impracticable to serve the record of trial on the accused may the accused's record of trial be served on an accused's defense counsel as a substitute for service on the accused. R.C.M. 1104(b)(1)(C). Under this "substitute service" provision, trial counsel must prepare an explanation for the failure to serve the accused with his copy of the record and include that explanation in the record of trial. *Id.* No such explanation was included in the original record received by the court other than a copy of the aforementioned email, and there is no evidence the Government sought to invoke the substitute service procedure.

Appellant asserts he did not receive a copy of the record of trial until 5 December 2018, thereby preventing him "from submitting matters for [the convening authority's] consideration." The Government plainly failed to serve Appellant with either the staff judge advocate's recommendation or the authenticated record of trial before forwarding those matters to the convening authority

for action. We find this failure somewhat inexplicable considering Appellant was in the military's custody at all relevant times during this post-trial processing. However, Appellant's complaint that he was precluded from submitting matters to the convening authority is equally puzzling considering that he did, in fact, submit matters to the convening authority, including a letter addressed to the convening authority that Appellant himself signed.

When an appellant alleges error with respect to the convening authority's post-trial review, we conduct a three-part analysis to determine if the appellant has met the threshold requiring our relief. The appellant must: (1) allege error; (2) allege prejudice resulting from the error; and (3) "show what he would do to resolve the error if given such an opportunity." *United States v. Wheelus*, 49 M.J. 283, 288 (C.A.A.F. 1998). "Because of the highly discretionary nature of the convening authority's action on [a] sentence," we grant relief if Appellant presents "some colorable showing of possible prejudice" affecting his opportunity for clemency. *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000) (quoting *Wheelus*, 49 M.J. at 289).

Appellant has demonstrated the Government committed error in proceeding with post-trial processing without first serving him with the record of trial.[11] Appellant, however, does not allege any prejudice or explain what he would have done differently had he been served with the record of trial prior to the convening authority taking action. Instead, Appellant asserts there "appears to be a nefarious plot underlying this," which he says was rooted in the convening authority not wishing to have Appellant's case interfere with the convening authority's holiday plans by having to take action too close to Christmas. Aside from this theory, Appellant simply states his rights were violated. We agree with Appellant that the Government failed in its post-trial processing obligations, but Appellant has not alleged any prejudice, and we see none. Appellant submitted matters to the convening authority requesting relief in terms of financial support for his family, which the convening authority partially granted. He has not alleged he would have submitted anything new or different had he been first served the record of trial, and Appellant is therefore entitled to no relief for this error.

## G. Ineffective Assistance of Counsel

Appellant cites a number of ways he claims he received ineffective assistance from his two trial defense counsel. He asserts his counsel: failed to leverage his mental health condition to seek pretrial dismissal of charges; used his mental health issues to coerce him into pleading guilty; failed to raise a

---

[11] Although the Government likewise failed to serve Appellant with the staff judge advocate's recommendation prior to action, Appellant does not assert this error.

defense of entrapment; failed to assert Appellant did not actually possess the child pornography seized from his electronic devices; failed to raise a speedy-trial motion; and failed to seek suppression of the evidence seized from his cell phone. Neither appellate defense nor appellate government counsel addressed this last claim in the briefs initially filed with this court, and the original declarations from trial defense counsel were likewise silent on the issue. We specified an issue for additional briefing by the parties asking whether trial defense counsel were ineffective in not moving the military judge to suppress the fruits of the search of Appellant's phone. We further directed trial defense counsel to supplement their declarations to address this allegation.

**1. Law**

The Sixth Amendment to the United States Constitution guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review claims of ineffective assistance of counsel de novo. *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006) (citation omitted).

An appellant "must surmount a very high hurdle" to successfully assert ineffective assistance of counsel. *Id.* (quoting *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000)). Pursuant to *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Appellant has the burden of demonstrating:

> (1) a deficiency in counsel's performance that is so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced the defense through errors so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Tippit*, 65 M.J. at 76 (citations and internal quotation marks omitted).

We employ a presumption of competence, and we apply a three-part test in assessing whether that presumption has been overcome: (1) "is there a reasonable explanation for counsel's actions?;" (2) "did defense counsel's level of advocacy fall measurably below the performance . . . [ordinarily expected] of fallible lawyers?;" and (3) "if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result?" *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (omission and alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

In the face of a guilty plea, an appellant must also "show specifically that 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Alves*, 53 M.J. at 289 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

### 2. Additional Background and Discussion

#### a. Appellant's Mental Health

On appeal, Appellant asserts his trial defense counsel "disregarded [his] severe mental illnesses," and an effective defense counsel would have been able to "prove that [he] did not intend on committing any serious criminal conduct." Our analysis begins with our observation that Appellant's claims of mental illness are internally contradictory. At one point in his declaration, Appellant avers "[t]he Air Force Mental Health system failed to attempt to figure out what was wrong with [him]," but at another point, he said he received "a kaleidoscope of different diagnoses from major depressive disorder to obsessive compulsive personality disorder to adjustment disorder and finally back to major depressive disorder." Appellant also claims he was once "initially diagnos[ed]" with post-traumatic stress disorder, but that diagnosis was—in his words—"quickly swept under the rug," and that particular psychiatrist "gave up on [Appellant] and claimed [he] was 'malignant.'" Appellant asserts he has "untreated ADHD and autism," yet he also explains an evaluation for possible autism was never conducted due to his court-martial. In preparing for trial, Appellant suggested to his trial defense counsel that he could claim he "was bipolar" and use that as a defense. Appellant did not provide his trial defense counsel any evidence substantiating his above claims of mental health issues, and he submitted none to his court-martial and none to this court on appeal.

In preparing for trial, trial defense counsel sought and obtained Government funding for a forensic psychologist to assist, in part, in assessing whether Appellant lacked mental responsibility at the time of his offenses. Appellant argues that had his mental health been "looked into," there would have been "a chance the entire court-martial could have been avoided" and "the case may have been dropped." His theory appears to be that his mental health condition prevented him from understanding "Courtney" was held out as a 14-year-old child, in spite of his stipulation to the contrary at trial.

According to Appellant's trial defense counsel, they discussed with Appellant the possibility of requesting an R.C.M. 706 inquiry into Appellant's mental responsibility at the time of the offenses, and Appellant replied, "No, I knew what I was doing." They also assisted Appellant in preparing his seven-page written unsworn statement in which he discusses being diagnosed with "possible PTSD and major depressive disorder while definitively being diagnosed with obsessive compulsive personality disorder" as well as an adjustment disorder.

Lack of mental responsibility at the time of the commission of an offense is an affirmative defense when "the accused, as a result of a severe mental dis-

ease or defect, was unable to appreciate the nature and quality or the wrongfulness of his or her acts. Mental disease or defect does not otherwise constitute a defense." R.C.M. 916(k)(1). The accused bears the burden of establishing a lack of mental responsibility by clear and convincing evidence. R.C.M. 916(k)(3)(A). "[N]onpsychotic behavior disorders and personality defects" do not qualify as a "severe mental disease or defect." R.C.M. 706(c)(2)(A). A person who does not appreciate the nature and quality of his act is someone who does not have the requisite criminal intent, "because he cannot comprehend his crimes, including their consequences." *United States v. Martin*, 56 M.J. 97, 109 (C.A.A.F. 2001). Efforts to conceal one's criminal activity can be evidence that a person appreciates the wrongfulness of his acts. *See id.* at 110. Bipolar disorder may be severe enough of a mental disease or defect to raise questions regarding an accused's mental responsibility, but it "does not negate responsibility in all cases." *United States v. Falcon*, 65 M.J. 386, 391 (C.A.A.F. 2008) (quoting *United States v. Shaw*, 64 M.J. 460, 463 (C.A.A.F. 2007)).

We disagree with Appellant's contention that his counsel were ineffective in not pursuing a defense based upon a lack of mental responsibility. Importantly, Appellant does not actually claim he was diagnosed as having bipolar disorder. On appeal, he discusses various diagnoses he received from mental health professionals, and bipolar disorder is not one of them. Notably, he asserts he "likely [has] ADHD or Type 1 Bi-polar disorder," without any explanation as to how he came to that conclusion. According to his trial defense counsel, Appellant raised the prospect of claiming he had bipolar disorder as a defense, but conceded that he "knew what [he] was doing" when he committed his offenses.

Even if we were to conclude Appellant had a serious mental disease or defect, the evidence in this case renders the likelihood of Appellant mounting a successful defense based upon lack of mental responsibility extremely low. Appellant's argument on appeal is not that he did not appreciate the nature and quality or the wrongfulness of his communication with "Courtney," but that he miscalculated her age and erroneously thought she was 19 years old. From this premise, Appellant asserts he was merely engaging in "age play" with a consenting adult in which he (and "Courtney") pretended "Courtney" was underage. In other words, Appellant argues his mental condition interfered with his ability to compute "Courtney's" stated age, but that he cogently continued with the rest of the conversation—including sending her pictures and links to pornography.

There are a host of flaws in this proposed defense based solely on the messages between Appellant and "Courtney." First, "Courtney" told Appellant in her second message to him, "well my dad left along time ago . . . I'll be 15 in dec so 6 years ago." Appellant claims his mental illness led him to believe

"Courtney" was saying her father left when she was 15, which was 6 years ago. The next day, Appellant asked "Courtney" if she was a virgin. She said she was, and Appellant discussed his past experience with having sex with a virgin to which "Courtney" responded, "Was she my age." Appellant wrote, "19," and then asked "Courtney" what she masturbated with. She replied, "I don't never tried that" and "My mom would kill me." About 45 minutes later in the conversation, "Courtney" noted, "I'm 14." Appellant argues that when he wrote, "19" and Courtney did not respond with a different age, that indicated to him that she was saying she, too, was 19. Appellant also argues he was thrown off by the "I'll be 15 in dec so 6 years ago," which—if calculated using Appellant's purported misinterpretation—would have made "Courtney" 21, not 19.

Second, there is nothing in either the advertisement Appellant responded to or in any of the messages between him and "Courtney" suggesting that she was an adult who wished to engage in "age play." To the contrary, the conversation is punctuated with comments from Appellant trying to ascertain whether or not "Courtney" was "real" and him trying to be "safe." For example, he asked her to pose with a peace sign "to prove [she was] real," and said, "I'm not doing anything until I can prove you're real." Appellant asked "Courtney" to send him pictures, and she said she was not comfortable sending them, leading Appellant to respond, "Hey I'm just being safe too." He told "Courtney" at one point he was bothered by "how upfront" she wanted him to be and sent her a "meme" that read, "It's a trap." Had Appellant truly believed he was talking to an adult, there would be no reason for him to ask for pictures of an adult posing online as a child, nor would he be trying to determine whether the person he was talking to was "real," much less be concerned with "being safe."

Third, much of the conversation consisted of Appellant and "Courtney" trying to align Appellant's schedule with "Courtney's" mother's absence so that they could meet in person, a seemingly pointless endeavor if Appellant and "Courtney" were trying to maintain the fiction of "Courtney" being a child via "age play."

Fourth, if Appellant really believed "Courtney" was telling him she was at least 19, if not 21, then there was no "age play" going on, because Appellant believed she was holding herself out as an adult and not pretending to be underage. Assuming the essence of "age play" involves an adult pretending to be a child, Appellant's belief that "Courtney" was telling him she was an adult and her never suggesting she was not renders his contention on appeal simply unbelievable.

Appellant's attempts to establish that "Courtney" was "real" not only belie his claim that he believed "Courtney" was an adult, but they demonstrate his keen appreciation for the wrongfulness of his conduct. According to Appellant's trial defense counsel, their forensic psychologist consultant arrived at this very

same conclusion and said he would have to concede he did not believe Appellant was engaging in "age play" with "Courtney." We do not find Appellant's defense of mental responsibility, which would be that his mental disease or defect manifested itself only at that moment when he read the "I'll be 15 in dec so 6 years ago" message, to have any reasonable chance of success based upon the evidence here. Appellant has not asserted he would have pleaded not guilty had trial defense counsel mounted this defense, and we see no reason to believe he would have. As such, even if we concluded trial defense counsel should have proposed mounting a defense based upon lack of mental responsibility, Appellant would be entitled to no relief.

### b. Appellant's Decision to Plead Guilty

Appellant claims his trial defense counsel took their knowledge of Appellant's mental health issues and "utilized that information for [their] own benefit by coercing [him] into a poor PTA" by exploiting his "fragile emotional state," which he says was the product of being separated from his children. Appellant further claims his defense counsel "manipulated [him] via [his] mental health conditions in order to break [him] down psychologically;" that his trial defense counsel were colluding with trial counsel in order to compel him to enter into a PTA; and that his trial defense counsel told him to perjure himself by pleading guilty.

In responding to Appellant's claims, trial defense counsel submitted declarations explaining they only began pursuing PTA negotiations with the Government when Appellant decided—about a week before trial—that he wanted to explore a PTA. Supporting this proposition, trial defense counsel included an email from Appellant dated six days prior to trial in which Appellant says he would "like to try" securing a PTA because he "[did not] want to be missing for such a significant part of [his] daughters['] lives." Trial defense counsel further assert they repeatedly emphasized to Appellant that it was his decision whether to plead guilty or not guilty, a proposition Appellant does not dispute.

At trial, Appellant told the military judge, under oath, that: no one forced him to enter the PTA; he was satisfied with his counsel's advice on the PTA; he entered the agreement of his own free will; no one tried to force him to make the agreement; he had fully consulted with his counsel on his decision to plead guilty; he was satisfied with his counsel; and that he was satisfied his counsel's advice was in his best interest. Moreover, Appellant told the military judge he was pleading guilty because Appellant was convinced he was, in fact, guilty, and he further explained to the military judge how he had committed the offenses he was charged with.

Appellant would have us believe his defense counsel manipulated him by leveraging his mental state against him as part of a conspiracy with the Government to force Appellant not just to enter a PTA, but also to falsely claim he committed the charged offenses. We are unpersuaded Appellant was so mentally fragile that he was willing to admit to offenses he did not commit. Notably, Appellant's submission to this court spans some 200 single-spaced pages in which he extensively cites to federal, state, and military case law, as well as statutes, regulations, military rules of evidence, rules for courts-martial, constitutional provisions, and even federal rules of criminal procedure. Even though we do not find the vast majority of his claims persuasive, Appellant has crafted creative and complex arguments supporting his various positions by marshalling a copious amount of legal authority. Trial defense counsel explained that they found Appellant to be "an intelligent and rational individual who was very active in his own defense and searched for every possible answer to his dire legal conundrum," which corresponds with our own assessment of Appellant's legal and intellectual prowess. Based upon our review of Appellant's submission on appeal and the record of trial, we have no reason to doubt Appellant was focused on and energetically engaged in his defense.

We are similarly unpersuaded that Appellant's trial defense counsel "coerced" him into entering the PTA, pleading guilty, and falsely telling the military judge he had committed the offenses he was charged with. Appellant has not set out specific facts explaining how he was coerced into doing any of these things, much less what trial defense counsel's motivation could have possibly been for engaging in such serious alleged misconduct. Appellant's claims are speculative and conclusory, at best. Moreover, Appellant has not set forth any facts that would rationally explain why he told the military judge he was pleading guilty of his own free will, that no one forced him to enter the PTA, and that he was satisfied with his counsel, yet is taking an entirely opposite position on appeal.

We further find little credence in Appellant's claims by virtue of his clear concessions of guilt. At trial, Appellant conceded the appropriateness of a punitive discharge in his written unsworn statement, writing, "[b]ecause of the crimes I've committed, I feel that it is appropriate that I be separated with a punitive discharge." In the letter he sent to the convening authority more than two months after his court-martial in support of his clemency request, Appellant wrote that he was "truly sorry" for his "reprehensible actions that are beyond even [his] own moral standards." Appellant explained why he pleaded guilty: "I decided to come clean as the first step in clearing my conscious [sic], repenting, and ensuring I receive the help I need." He also promised he would "never do anything like this again" and specifically noted he was not asking that his charges be set aside or his confinement reduced, because those were "debts to society that need repaid [sic]." Appellant described his conduct as

"heinous" and discrediting to the Air Force, his family, and himself. Even in his personal submission to this court, Appellant states he was "acting in an immoral way that was leading [him] down a path of self-destruction and was against the UCMJ."

We can decide this issue without ordering a fact-finding hearing,[12] and we reject Appellant's claims.

### c. Defenses Not Raised

Appellant asserts his trial defense counsel were ineffective in not advancing certain defenses, such as that he was entrapped or that he did not actually possess child pornography. Appellant, however, pleaded guilty to the charged offenses. Appellant may not now contradict his guilty plea, the stipulation of fact he entered into at trial, and the sworn confessional statements he made at trial. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997) (citing *United States v. Wilson*, 44 M.J. 223 (C.A.A.F. 1996)).

Appellant told the military judge he believed "Courtney" was 14 years old during his conversation with her, a fact he learned "within the first couple of responses" he received from "Courtney" and that the sexual comments originated with him, not with "Courtney." Appellant further admitted he possessed images of child pornography involving actual minors, and that he came into possession of them by intentionally downloading them from various Internet sites and then saving them on both his cell phone and his laptop computer.

By pleading guilty, Appellant affirmatively disavowed the lines of defense he is now advocating. Had his counsel advanced these theories at trial, the military judge would have necessarily rejected his guilty plea, and his PTA would have been of no effect. Given Appellant's stated desire to plead guilty pursuant to the terms of the PTA he had signed, Appellant may not now claim his counsel did anything untoward by not undermining that guilty plea. Appellant's claim is without merit and warrants no relief.

### d. Speedy Trial

Appellant argues his counsel were ineffective by not asserting at his court-martial that his right to a speedy trial had been violated. We do not see any credible argument that such a right was violated, so we cannot conclude his trial defense counsel were ineffective in not advancing the claim.

Appellant was escorted by his first sergeant and his flight chief to the local AFOSI detachment for questioning on 17 July 2017. According to Appellant, he was kept at the detachment for most of the day. When he was about to be

---

[12] *See Ginn*, 47 M.J. at 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam).

released, Appellant told his first sergeant he was going to "jump in front of a freight train," noting that such trains regularly passed through the base. Upon hearing this, the first sergeant took Appellant to a nearby emergency room, resulting in Appellant thereafter being committed for "four or five days" in a civilian mental health facility. After his release, Appellant performed his military duties and was not otherwise confined or restricted until his court-martial on 27 August 2018, although he was subject to no-contact orders with respect to his wife and children, apparently at his wife's request.[13]

As noted above, Appellant's unconditional guilty plea waived any speedy trial issues under R.C.M. 707 and the Sixth Amendment. While Appellant could have preserved a violation of his speedy trial rights under Article 10, UCMJ, had he litigated a motion under that provision at trial, such a motion would have been fruitless because Appellant was not in pretrial confinement. Article 10, UCMJ, protects an accused from "languish[ing] in confinement or arrest without knowing the charges against him and without bail." *United States v. Schuber*, 70 M.J. 181, 187 (C.A.A.F. 2011) (citing *United States v. Mizgala*, 61 M.J. 122, 124 (C.A.A.F. 2005)). Even if we were to conclude the day Appellant spent at the AFOSI detachment and the following four or five days he was in a mental health facility amounted to pretrial confinement— which we do not—Appellant has not articulated how the Government failed to exercise "reasonable diligence in bringing the charges to trial" during this period of five or six days. *United States v. Cooley*, 75 M.J. 247, 259 (C.A.A.F. 2016) (citation omitted). The record in Appellant's case discloses AFOSI conducted the majority of their interviews between the day Appellant was initially apprehended—17 July 2017—and 8 August 2017, which indicates reasonable diligence in investigating the scope of Appellant's misconduct for the five or six days at issue here. Thus, we perceive no legitimate argument that Appellant's Article 10, UCMJ, rights were violated. By corollary, his trial defense counsel were not ineffective in not filing a motion which had neither a basis in law nor any chance of success.

Similarly, a motion under R.C.M. 707 would have gained no traction, as charges were preferred on 7 February 2018 and Appellant was arraigned 82 days later on 30 April 2018, well within the rule's 120-day limit. Under a Sixth Amendment analysis, we consider four factors: the length of the delay, reasons for the delay, whether a demand for a speedy trial was made, and prejudice to the accused. *United States v. Danylo*, 73 M.J. 183, 186 (C.A.A.F. 2013) (citations omitted). Based upon the record before us, Appellant was tried less than

---

[13] Appellant's wife and children left the state at the outset of the investigation, and she filed for divorce prior to Appellant's trial.

seven months after charges were preferred. Appellant has not alleged he demanded a speedy trial, and we see nothing in the record indicating otherwise, nor has he alleged any prejudice. Because no speedy trial motion was litigated in Appellant's case, we do not have much information about what occurred between the preferral of charges and Appellant's trial. Nonetheless, we assess Appellant's likelihood of mounting a successful Sixth Amendment claim based upon that period of time to be extremely remote, and we conclude his counsel were not ineffective in not raising a speedy-trial complaint under either R.C.M. 707 or the Sixth Amendment.

### e. Search of Appellant's Cell Phone

Appellant avers his first sergeant and flight chief came to his house and asked Appellant to retrieve his cell phone. Appellant did so and relinquished the phone before accompanying the two to the AFOSI detachment. Upon being advised of his rights under Article 31, UCMJ, 10 U.S.C. § 831, Appellant invoked his right to counsel and questioning ceased. At some point thereafter, Appellant alleges two AFOSI agents returned to the interview room he was in, told him they had search authorization for the phone, and directed him to enter the passcode to unlock the phone, which Appellant did. Appellant had to enter the passcode three or four more times—in accordance with instructions from the agents—to disable the passcode on the phone. On appeal, Appellant alleges he told his trial defense counsel about the foregoing, and they "failed to even attempt to suppress the subsequently obtained evidence."

Assuming Appellant's recitation of the events leading up to him unlocking his phone is accurate—which is to say he was in custody and he invoked his right to counsel—the agents violated Appellant's Fifth Amendment rights.[14] *United States v. Mitchell*, 76 M.J. 413, 418–19 (C.A.A.F. 2017). As a result, evidence derived from the search of Appellant's phone should have been suppressed unless the Government could establish an exception to the exclusionary rule. *See* Mil. R. Evid. 305(c)(2). Failure to make a motion to suppress this evidence prior to entering pleas constitutes waiver of the issue. Mil. R. Evid. 304(f)(1); s*ee United States v. Swift*, 76 M.J. 210, 218 (C.A.A.F. 2017). Even if this waiver rule did not apply in Appellant's case, Appellant explicitly waived all waivable motions as part of his PTA, an outcome guaranteed by his unconditional guilty plea. Appellant's argument, which has not been waived, is that his trial defense counsel were ineffective in not pursuing a suppression motion regarding the phone.

---

[14] U.S. CONST. AMEND. V.

Because no suppression issue was litigated at trial, we are unable to determine whether Appellant's version of events is accurate, whether the Government would have been able to successfully demonstrate an exception existed to the ordinary rule of exclusion and, to a lesser degree, what derivative evidence would have been suppressed. This fact, however, does not prevent us from resolving this issue adversely to Appellant, as we conclude there is a reasonable explanation for trial defense counsel not raising this motion.

In addition to Appellant's cell phone, investigators searched various other electronic devices Appellant used, to include a large hard drive, a thumb drive, and a laptop. All of these items contained potential child pornography as well as evidence of Appellant purposely storing the child pornography on the devices. These drives and the laptop were searched after Appellant's wife granted agents consent to seize and search them, largely rendering moot any debate over whether the agents had probable cause to search those devices. *See* Mil. R. Evid. 314(e).[15] Thus, successfully suppressing Appellant's cell phone would have yielded only a marginal benefit to Appellant in that it would have reduced the number of images of child pornography available to the Government, but it would not have been fatal to the charge because of the images found on Appellant's other devices. Because Appellant's counsel used the PTA as a negotiation opportunity to whittle down the number of images of child pornography Appellant would plead guilty to possessing, choosing to litigate the charge would have deprived the Defense of the benefit of those negotiations, likely subjecting Appellant to punishment for more, not less, child pornography. Suppression would have also had negligible impact on the specifications arising from Appellant's communications with "Courtney" considering the investigators already possessed all the messages and images Appellant sent "Courtney," to include pictures of himself.

Under these facts, waiving the issue of the violation of Appellant's Fifth Amendment rights in order to obtain a PTA at Appellant's behest was a reasonable approach. We do not find trial defense counsel's performance deficient for giving up this issue in exchange for securing a PTA guaranteeing Appellant a ceiling on his punitive exposure. Moreover, Appellant has not asserted he would have pleaded not guilty and insisted on going to trial had the evidence from his phone been suppressed, and we see no reasonable probability of him having done so. As a result, even if we concluded his counsel had been ineffective by not raising this motion, he still would not be entitled to relief.

---

[15] The AFOSI agents also obtained search authorization for the devices, and Appellant stipulated at trial such authorization was valid.

**H. Delay in Appellate Review**

Appellant's case was docketed with this court on 14 December 2018, and Appellant filed his initial assignments of error 291 days later on 1 October 2019 after requesting and receiving seven enlargements of time over the Government's objection. The Government filed its answer on 5 December 2019, 65 days later, after we ordered trial defense counsel to provide affidavits responsive to Appellant's allegations of ineffective assistance of counsel. Subsequently, we specified an additional issue which required the parties to submit additional briefs and trial defense counsel to submit supplementary declarations.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

This case exceeded the 18-month standard between docketing and appellate decision by just over two months. With respect to exceeding the 18-month standard for producing this opinion, we note Appellant's personal submission to the court is some 200 pages long, single-spaced and produced in a small font. The submission contains extensive citations to myriad legal authorities and sets out detailed facts—at length—which were not part of Appellant's record of trial. Many of Appellant's arguments are complex and not easily comprehended. He further included a number of exhibits and letters, the relevance of which was not immediately obvious. In addition, Appellant took nearly ten months to file his assignments of error after requesting seven enlargements of time.

In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). Appellant has not demonstrated any oppressive incarceration, and

his appeal has not resulted in any reduction in his sentence. He has not alleged any particularized anxiety or concern with respect to the timing of the processing of his appeal. We are affirming the findings and sentence in Appellant's case. Since we are not returning his case for a rehearing, his ability to present a defense at such a rehearing is not impacted. Finding no qualifying prejudice from the delay, we also conclude there is no due process violation, as the delay is not so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court